IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 17, 2005 Session

## IN RE:  SENTINEL TRUST COMPANY

**A Direct Appeal from the Chancery Court for Lewis County**
**No. 4781      The Honorable R. E. Lee Davies, Chancellor**

————————————

**Nos.: M2005-00031-COA-R3-CV, M2005-01773-COA-R3-CV - Filed December 29,  2005**

————————————

## SENTINEL TRUST COMPANY, et al v. KEVIN P. LAVENDER

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 04-1934-I   The Honorable Walter C. Kurtz, Judge**

————————————

**No. M2005-01073-COA-R3-CV - Filed December 29, 2005**

————————————

This appeal involves three cases consolidated for oral argument.  Because of the duplication of the major issues in the cases, we consolidate the cases into one opinion.  The Commissioner of the Tennessee Department of Financial Institutions, acting on statutory authority, took emergency possession of a Tennessee trust company, filing due notice of such action in the Chancery Court of Lewis County.  Subsequently, the Commissioner gave notice, as required by statute, of the liquidation of the company, which was commenced in the Chancery Court of Lewis County.  The company filed a petition for writ of certiorari and supersedeas in the Chancery Court of Davidson County.  The court denied the petition for supersedeas and dismissed the writ of certiorari.  Appellants appeal.  We affirm.  In the Lewis County Chancery Court proceeding, the court approved the transfer by the Commissioner of the various fiduciary accounts administered by the company and other assets of the company, and the appellants appeal.  We affirm.  Included in the disposition of the property was real estate located in Bellevue, and the Commissioner filed a motion in the Lewis County Chancery Court for approval of the sale of this real estate.  Objections were filed to the Bellevue sale motion.  The court, after hearing proof, approved the sale.  Appellants filed separate appeals.  We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgments of the Trial Courts Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Carroll D. Kilgore of Nashville, Tennessee for Appellants, Sentinel Trust Company, Danny N. Bates, Clifton T. Bates, Howard H. Cochran, and Gary L. O'Brien

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General, Janet M. Kleinfelter, Senior Counsel for Appellee, Commissioner Kevin P. Lavender, Tennessee Department of Financial Institutions

J. Graham Matherne of Nashville, Tennessee for Appellees, Commissioner Kevin P. Lavender and Receivership Management, Inc., Receiver for Sentinel Trust Company

**OPINION**

Sentinel Trust Company is a state-chartered trust company located in Hohenwald, Lewis County, Tennessee. Danny N. Bates, Clifton T. Bates, Howard H. Cochran and Gary L. O'Brien ("Appellants") are all either former directors, officers and/or shareholders of Sentinel. Appellee, Kevin P. Lavender ("Commissioner") is the Commissioner of the Tennessee Department of Financial Institutions.

In April of 1999, the Tennessee General Assembly enacted Public Chapter 112, with an effective date of July 1, 1999. The enactment of Public Chapter 112 revised T.C.A. § 45-1-124[1]

---

[1] Public Act 112 made the following changes to T.C.A. § 45-1-124. T.C.A. § 45-1-124(d) was amended by adding the language and punctuation "trust companies," after the words "state banks," and before the words "savings and loan associations," and by deleting subsection (b) in its entirety and substituting the following as a new subsection (b). Changes are indicated below in bold:

> **(b) To the full extent consistent with such rights, liabilities, and penalties, all state banks and, to the extent applicable, all banks, shall hereafter be operated in accordance with the provisions of this chapter and chapter 2 of this title. Unless the commissioner determines otherwise, the provisions of chapters 1 and 2 of this title, and the rules thereof, shall also apply to the operation and regulation of state trust companies and banks whose purposes and powers are limited to fiduciary purposes and powers.**

> (d) Except to the extent inconsistent with or contrary to specific provisions of chapters 1, 2 and 3 of this title, Tennessee state banks, **trust companies,** savings and loan associations, and savings banks, and their directors, officers and shareholders shall be governed by and subject to the Tennessee Business Corporation Act, compiled in title 48, chapters 11-27, as the same may be amended from time to time, and successor

(continued...)

such that "the provisions of chapters 1 and 2 of [the Tennessee Banking Act], and the rules thereof, shall also apply to the operation and regulation of state trust companies and banks whose purposes and powers are limited to fiduciary purposes and powers." Under T.C.A. § 45-1-104, the Commissioner is charged with enforcing and administering the provisions of chapters 1 and 2 of Title 45 of the Tennessee Code Annotated. [2] On June 16, 1999, the Department of Financial Institutions ("Department") sent a letter to all Tennessee trust companies not previously under the Department's regulation, including Sentinel, informing the trust companies that, with the enactment of Public Chapter 112, they were now subject to the jurisdiction of the Department.

On December 31, 1999, the Department commenced a formal examination of Sentinel pursuant to T.C.A. §§ 45-1-124(h)[3] and 45-2-1602(a)(1).[4] The Department made the following findings: Sentinel had no written policies for any aspect of their Trust Administration Department. Sentinel's President and sole shareholder, Danny Bates, had virtually unrestricted access to all areas of the company with few compensating controls. Furthermore, the Department

---

(...continued)

statutes thereto. The commissioner has the authority to interpret the Tennessee Business Corporation Act as it applies to financial institutions subject to regulation by the commissioner.

[2] Chapter 1, Part 1, of Title 45, Department of Financial Institutions, reads:

The department, created by § 4-3-101, is charged with the execution of all laws relative to persons doing or engaged in a banking or other business as provided in this title, except for pawnbrokers covered by chapter 6 of this title or persons licensed under the Tennessee Title Pledge Act of 1995, chapter 15 of this title.

[3] T.C.A. § 45-1-124(h) reads as follows:

(h) All state trust companies operating on July 1, 1999, shall have such period of time as the commissioner determines to be reasonable and prudent to conform to the requirements of chapters 1 and 2 of this title and the regulations thereunder, but such period shall not exceed three (3) years from July 1, 1999. During this period of time, to conform to the requirements of chapters 1 and 2 of this title, the commissioner may conduct examinations at such company's expense, and apply the requirements of chapters 1 and 2 of this title as deemed appropriate.

[4] T.C.A. § 45-2-1602 reads as follows:

(a)(1) The commissioner shall, either personally or by competent examiner appointed by the commissioner, visit and examine every bank subject to the commissioner's supervision at least once in each year. The commissioner has discretion to determine the scope of the examination; provided, that a full-scope examination, as set out in subsection (b), shall be conducted by the commissioner or the commissioner's designee at least once in every three (3) years. The commissioner has discretion to accept, in any calendar year, all or part of an examination report of a federal banking regulatory agency conducted of a state bank in that year.

found that Mr. Bates was responsible for all of Sentinel activities including managing and monitoring existing accounts, compilation of the general ledger, asset management and account reconciliation. Additionally, the report stated that collateral enforcement costs were being paid by allowing overdrafts within the pooled fund against each defaulted bond-issuer, which consisted of fees and expenses associated with defaulted bonds that had not been collected. The Department's examination report noted these deficiencies and violations and gave Sentinel a composite rating of "3".[5] However, the report also included the analysis that "Management works aggressively" and that Sentinel had a "high rate of success in resolving defaulted bonds in favor of bondholders." The Department's report noted that Sentinel was a grandfathered trust company and had until three years after the July 1, 1999 enactment of Public Chapter 112 to come into compliance with the noted deficiencies and violations.

In November of 2000, the Department was made aware of a judgment from Davidson County Chancery Court against Sentinel in the case of ***National Commerce Financial Bancorporation v. Sentinel Trust Company,*** No. 97-2243-I. The lawsuit alleged that Sentinel had breached its contractual fiduciary obligations as trustee under trust indentures securing certain private placement notes. National Commerce Financial Bancorporation was awarded $2,226,047, a judgment that, if made final, would be in excess of Sentinel's capital and would deem the trust company insolvent. On November 16, 2000, the then Commissioner of the Tennessee Department of Financial Institutions, Bill Houston, served a Cease and Desist Order upon Sentinel, and downgraded Sentinel's composite rating from a "3" to a "5". In February of 2001, settlement negotiations took place between Sentinel and National Commerce Financial Bancorporation ("NCFB"). The judgment was settled for $575,000, which prevented Sentinel from being declared insolvent. The Cease and Desist Order was lifted in the context of the Department's year 2000 report, discussed *infra*.

On January 26, 2001, the Department began an examination of Sentinel for the year ending December 31, 2000. Following the examination, a report was issued by the Department on July 17, 2001. Again, the report noted that Mr. Bates had virtually unrestricted access to all areas of the company with few compensating controls. Additionally, the report found that there was no documentation of management's reconciliation and review procedures and no third party was reviewing Mr. Bates' reconciliation of deposit accounts. The report further noted that there were inconsistencies in the accuracy of the corporate and trust records and that there was no internal audit function in place. The report specifically stated that "[r]econciling trust and corporate general records was difficult" and that "the accuracy of reports appears suspect due to inconsistencies in totals, as well as, the varying formats and data processing systems used." While it was noted that the "overall account administration appears generally acceptable and the

---

5

All trust companies and bank trust departments in Tennessee are evaluated under the standards provided by the Uniform Interagency Trust Rating System. Under this system, a trust company or department is evaluated in five component areas: management; operations; internal controls and audits; earnings; compliance and asset management. The trust company is rated "1" to "5" (with "1" being the best and "5" being the worst) in each component area and then given a composite rating between "1" and "5."

company complies with the governing account instruments," the report found that guidelines and policies in regards to operations, internal controls, reconcilement of deposits and securities, balancing of accounts, information technology, audit function, investment management and contingency plan were all needed in order to prove supervision of Sentinel's corporate trust activities. Sentinel received a composite rating of "3" following the Department's examination of Sentinel's operations in 2000, and it was recommended that Sentinel be required to submit progress reports to the Department every ninety days. Once again, the report noted that Sentinel was a grandfathered trust company and had until three years after the July 1, 1999 enactment of Public Chapter 112 to come into compliance with the noted deficiencies and violations.

On April 22, 2002, the Department began its third annual examination of Sentinel for the year ending December 31, 2001. During this examination, former Commissioner Houston was replaced by the Appellee, Kevin P. Lavender. During the course of the examination, Mr. Bates admitted that he had left $800,000 in assets off the Company's balance sheet when he submitted call reports to the Commissioner in an attempt to make Sentinel look less fiscally solvent while negotiating a settlement with NCFB. The report that resulted from the examination of Sentinel's 2001 operations was issued by Commissioner Lavender on February 4, 2003. The report noted, again, that Mr. Bates continued to be primarily responsible for trust operations and continued to perform the majority of the corporate operation tasks himself. The report stated that the Board of Directors of Sentinel had adopted the Federal Deposit Insurance Corporation's Statement of Principle of Trust Department Management as part of its Policy Manual. However, the report noted that Sentinel continued to operate without a formal internal audit program and that Mr. Bates continued to record and reconcile all depository accounts and handle most of the fiduciary bookkeeping without any internal review. Most notably, the report raised the issue of overdrafts in the accounts of the defaulted bond issues and noted that it was not clear as to how these overdrafts were funded. The report speculated that it appeared that the overdrafts were being funded from other bond issues and warned of the necessity of the trust company "to keep trust account assets separate," and that "the funds of one bond issue are not to be used for another bond issue." Sentinel again received a letter written by Commissioner Lavender that accompanied the examination report, in which, the Commissioner requested that Sentinel management "provide information as to how overdrafts are currently being funded for various bond issues." On April 16, 2003, Mr. Bates wrote the Commissioner explaining funding of the overdrafts. The pertinent part of that letter reads as follows:

> Fees and expenses are charged to the appropriate principal or income cash account of trust accounts as and when the fees and expenses are incurred. As a result, a cash overdraft will occur if payment is charged to an account holding little or no actual cash assets. In virtually all cases, however, the account will have non-cash assets in the process of being converted to cash and/or may hold collectible cash apart from the trustee. . . . Each trust account is separately identified and accounted for on a stand-alone basis. Cash and investment securities are collectively held for the individual accounts.

Non-fungible assets such as real property, receivables and other pledged collateral are counted as nominal assets until converted into cash and received into the account. Fees and expenses are funded from collective cash assets and charged to appropriate individual trusts.

\* \* \*

When assets are converted to cash, the overdraft is liquidated. All trust accounts should hold assets in excess of any temporary cash overdraft. Sentinel recognizes that disbursements for a trust in excess of recoverable assets are to be recorded as a corporate expense. That has been and remains its corporate policy.

On June 13, 2003, the Department began an examination of Sentinel for the year ending December 31, 2002. On July 25, 2003, the Department was informed that Sentinel's audit firm, Charles Welch and Associates, had withdrawn and declined to complete Sentinel's 2002 audit due to the inability of the accounting firm to obtain from Sentinel management evidence needed to evaluate the fair value of Sentinel's corporate fiduciary receivables. Mr. Bates then hired an independent CPA, Mr. Jim Brewer, to reconcile Sentinel's cash accounts, including the pooled fiduciary account. In response to this information, the Department sent a memo to Mr. Bates on August 8, 2003. In the memo, the Department requested explanations of several accounting issues that arose during the examination, in particular, the question of why the cash balance did not reconcile to either the fiduciary or corporate balance sheet totals or to the bank account statements. Mr. Bates responded to the Department's request in writing stating that, while the "cash balance figure reported on the Trust Department Balance Sheet does not exist as an account register," which can be examined independently of the actual trust accounts, Mr. Bates believed Sentinel's accounts were reconciled and balanced. On May 31, 2003, Mr. Bates provided an Account Reconciliation Report.

On October 6, 2003, the Commissioner met with the Board of Directors of Sentinel to inquire as to how expenses were funded for defaulted bond issues. The Commissioner also stressed the urgency for a financial statement audit of the company in order for the Commissioner to determine the solvency of Sentinel. On October 10, 2003, Mr. Bates advised the Commissioner that a new CPA firm, Kraft CPAs ("Kraft"), had been engaged to perform an audit for 2002.

On March 19, 2004, Kraft provided the Department with a copy of the audit report of Sentinel for the year ending December 31, 2002. In the report, Kraft identified approximately $9.4 million in fiduciary account receivables, of which approximately $7.5 million resulted from expenditures Sentinel had made in connection with defaulted bond issues and related unreimbursed costs and expenses. However, Kraft declined to give an opinion as to the financial status of Sentinel because Sentinel's records had been inadequate for Kraft to satisfy themselves as to the existence, amount, or collectability of the receivables. Kraft also reported that: (1)

Sentinel's Trust Department and companies cash had been commingled in the same bank account, (2) Sentinel appeared to have paid company expenses from the Trust Department account and reimbursed the Trust Department at a later date, and (3) Sentinel had not been preparing an accurate reconciliation of the bank balance to the general ledger on a monthly basis but was simply adjusting the general ledger balance to the bank's monthly balance, which resulted in the company and Trust Department significantly overstating cash as of December 31, 2002.

Following the receipt of the 2002 audit report, Department examiners returned to Sentinel on March 22, 2004 to conduct a reconciliation of the balance of the fiduciary accounts as of December 31, 2003, the balance in the pooled fiduciary account, and the overdrafts on the defaulted bond issues. This reconciliation reflected a net cash shortage in the pooled fiduciary account of $5,789,011. After notifying Sentinel of net cash shortage, the Department examiners met with Mr. Bates and a Kraft auditor on April 1, 2004. At the meeting, Mr. Bates asked whether the Department's analysis and resulting determination of an approximate $5.7 million shortfall was incorrect. Mr. Bates admitted that the $5,789,011 figure was close to the amount of the shortfall. However, Mr. Bates failed to bring to the Department examiner's attention the alleged existence of a substantial amount of outstanding fees owed to Sentinel that would be available to offset this cash shortage.

On April 5, 2004, the Commissioner sent a letter to Sentinel requesting an opinion of counsel regarding Sentinel's practice of funding defaulted bond expenses with funds from other non-related bond issues. The Department defined this practice as follows:

> Sentinel served as the indenture trustee for various high-yield, unregistered municipal and corporate bonds. In a number of instances, the debtor had failed to make the scheduled principal and/or interest payments and the bond had been declared in default per the terms of the indenture. Sentinel, in its role as indenture trustee, would then fund various expenses relative to these defaulted issues, such as insurance, security, legal and other professional fees, in an effort to protect the value of the underlying collateral. While the governing indenture and/or bondholder indemnification usually provided for the reimbursement of these expenses from the proceeds from the sale of the collateral, Sentinel did not have adequate corporate liquidity to fund these expenses, in the event that the defaulted issue did not already have sufficient funds on deposit with Sentinel. Thus, in order to fund these expenses, Sentinel would "borrow" from other non-related bond issues by writing checks and/or wires on its pooled demand deposit account . . . . This practice of "borrowing" from the pooled fiduciary account to fund the expenses of the defaulted issues resulted in approximately $7.5 million in

-7-

fiduciary account receivables that Kraft had been unable to substantiate as to their actual existence, amount or collectability.

On April 28, 2004, at a meeting with the Commission, Sentinel, and Sentinel's legal representatives from Waller, Lansden, Dortch & Davis, PLLC ("Waller Lansden"), Sentinel's legal counsel indicated that Sentinel's practice of funding defaulted bond expenses with funds from other non-related bond issues was "inappropriate" and that such expenses were typically funded with corporate assets. During a meeting of the same parties on April 30, 2004, Mr. Bates admitted that his most recent calculations showed that Sentinel had a deficit fiduciary cash position of approximately $7.25 million. Following this meeting, the Sentinel Board of Directors adopted a new Corporate Trust Policy, which provided that, in order to avoid the loss of collateral or senior secured position, "advances may be made up to the expected liquidation value," but that "funds may not be advanced from any trust account if it is anticipated that the advance creates an overdraft in the affected account."

On May 3, 2004, and as a result of Mr. Bates' May 3, 2004 admission that his most recent calculations showed that Sentinel had a deficit fiduciary cash position of approximately $7.25 million, the Commissioner issued an Emergency Cease and Desist Order and Notice of Charges against Sentinel, pursuant to T.C.A. §§ 45-1-107(a)(4), (5) and (c).[6] The Order and Notice declared that the Commissioner had determined that Sentinel was operating in an unsafe and unsound manner and ordered Sentinel to make an initial infusion of capital in the amount of $2 million by the close of business on May 17, 2004, in order to partially replenish the fiduciary cash deficiency. In addition, the order directed Sentinel to submit a capital plan outlining their plans to completely replenish the fiduciary pooled account and the steps to be taken to provide sufficient operating capital. On May 6, 2004, Sentinel's legal counsel from Waller Lansden advised the Sentinel Board of Directors that it was in the best interest of the trust company for the Board to ask Mr. Bates to resign as president and director of Sentinel. Furthermore, the attorneys advised the Board that, if Mr. Bates did not voluntarily resign, they would have to resign as counsel to Sentinel. Mr. Bates refused to resign and Waller Lansden subsequently resigned from its representation of Sentinel.

---

[6] T.C.A. § 45-1-107(a)(4), (5) and (c) read as follows:

(a) In addition to other powers conferred by this title, the commissioner has the power to:
(4) Order any person to cease violating a provision of this title or lawful regulation issued under this title;
(5) Order any person to cease and desist from engaging in any unsafe or unsound banking practice when such practice is likely to cause insolvency or dissipation of assets or earnings of a state bank or is likely to otherwise seriously prejudice the interests of the depositors of a state bank; and

(c) Notice and opportunity for a hearing shall be provided in advance of any of the foregoing actions in this section taken by the commissioner, except the formulation of regulations of general application. In cases involving extraordinary circumstances requiring immediate action, the commissioner may take such action but shall promptly afford a subsequent hearing upon application to rescind the action taken.

On May 17, 2004, the Commissioner and Department staff met with Sentinel's new legal counsel, Mary Neil Price from the firm of Miller and Martin. Legal counsel admitted that they had not prepared the capital plan that the May 3 order of the Commissioner required because they did not have a "good enough handle on the financial situation." However, Sentinel's new legal counsel provided an outline of proposed steps in order to "improve Sentinel's financial position" and to "maximize funds available to repay any deficits in any default trust accounts for which funds are not available from other sources." These steps included: (1) certain actions to reduce Sentinel's operating expenses, (2) an attempt to accelerate collection of advanced expenses on the defaulted bond issues, and (3) the financing of real property owned by Sentinel. Again, there was no mention in the proposed steps of the existence of substantial fees (default and administrative) owed to Sentinel that would be available to maximize funds available to repay any deficits in any default trust accounts.

On May 18, 2004, the Commissioner took emergency possession of Sentinel, pursuant to T.C.A. §§ 45-2-1502 (2000);[7] and,pursuant to T.C.A. § 45-2-1502 (b)(1), filed notice in the

---

7

  T.C.A. § 45-2-1502, Commissioner in Possession, reads in pertinent part:
(a) The commissioner may take possession of a state bank if, after a hearing, the commissioner finds:
(1) Its capital is impaired or it is otherwise in an unsound condition;
(2) Its business is being conducted in an unlawful or unsound manner;
(3) It is unable to continue normal operations; or
(4) Its examination has been obstructed or impeded.
(b)(1) The commissioner shall take possession by posting upon the premises a notice reciting that the commissioner is assuming possession pursuant to this section and the time, not earlier than the posting of the notice, when such possession shall be deemed to commence. A copy of the notice shall be filed in a court of general or equity jurisdiction in the county in which the institution is located. The commissioner shall notify the federal reserve bank of the district of taking possession of any state bank which is a member of the federal reserve system, and shall notify the Federal Deposit Insurance Corporation of the taking possession of any insured bank.
(2) When the commissioner has taken possession of a state bank, the commissioner shall be vested with the full and exclusive power of management and control, including the power to continue or to discontinue the business, to stop or to limit the payment of its obligations, to employ any necessary assistants, to execute any instrument in the name of the bank, to commence, defend and conduct in its name any action or proceeding in which it may be a party, to terminate the commissioner's possession by restoring the bank to its board of directors, to appoint a receiver to have all of the rights, powers, duties and obligations granted to the commissioner in possession for the purpose of liquidation or reorganization, and to reorganize or liquidate the bank in accordance with §§ 45-2-1503 and 45-2-1504. As soon as practicable after taking possession, the commissioner shall make an inventory of the assets and file a copy thereof with the court in which the notice of possession was filed.
(3) When the commissioner has taken possession, there shall be a postponement until six (6) months after the commencement of such possession of the date upon which any period of limitation fixed by a statute or agreement would otherwise expire on a claim or right of action of the bank, or upon which an appeal must be taken or a pleading or other document must be filed by the bank in any pending action or proceeding.
*(c)(1) If, in the opinion of the commissioner, an emergency exists which will result in serious losses to the depositors, the commissioner may take possession of a state bank without a prior hearing. Any*

(continued...)

-9-

Chancery Court of Lewis County. Due to Sentinel's failure to submit a capital plan outlining the company's plans to replenish the fiduciary pooled account and failure to make an initial infusion of $ 2 million in capital by the May 17 deadline, and in light of the record as a whole, the Commissioner determined that taking possession of Sentinel was the appropriate action necessary to protect the bond issuers and bondholders. In addition, on May 18, 2004, the Commissioner issued an order appointing Receivership Management, Inc. ("Receiver") to act as the Receiver of Sentinel pursuant to T.C.A. § 45-2-1502(b)(2).

Immediately after taking possession of Sentinel, the Receiver and Department personnel began reviewing Sentinel's records to determine an accurate assessment of Sentinel's financial status. The fact that Sentinel was using two different accounting systems (Quick Books and AccuTrust fiduciary account system) hampered the process because the entries in the two systems were not consistently reconciled with each other or with the bank statements from the pooled fiduciary account. On June 15, 2004, the Department issued a preliminary report, which stated that,as of December 31, 2003, Sentinel had a cash deficiency in the pooled fiduciary account of $5,789,011. In the four months between December 31, 2003 and May 18, 2004, the deficiency grew and ranged from $7,612,218 in Quick Books to $8,430,722 in the AccuTrust fiduciary accounting system. The report further reflects that, as of May 18, 2004, Sentinel had corporate assets of $1,389,682 and was insolvent in an amount of at least $6,225,445.

On June 17, 2004, the Commissioner and Department personnel met with Mr. Bates and his new attorney, Carrol Kilgore, to give them an opportunity to respond to the findings reflected in the Department's report of Sentinel's financial status or, in the alternative, to submit a written response prior to the Commissioner taking any action with respect to the report. Neither Mr. Bates nor Mr. Kilgore made any substantive changes to the report, and despite having indicated they would submit a written response by the next day, they declined to do so. Consequently, based on the determination that Sentinel was insolvent in an amount of at least $6,225,000, that Sentinel did not have sufficient liquid assets to pay off its bondholders and creditors, that Sentinel did not have a viable plan for the infusion of sufficient capital to eliminate the $7.6 to $8.4 million cash deficiency in the pooled fiduciary account, and from the record as a whole, the Commission determined that liquidation of Sentinel pursuant to T.C.A. §§ 45-2-1502(c)(2)[8] and 1504[9] was necessary and appropriate. Accordingly, on June 18, 2004, the

---

[7](...continued)
*person aggrieved and directly affected by this action of the commissioner may have a review by certiorari as provided in title 27, chapter 9.* (Emphasis added).

[8] *See supra* note 9.

[9]     T.C.A. §§ 45-2-1504 reads:
(a) In liquidating a state bank, the commissioner may exercise any power of the office of commissioner, but shall not, without the approval of the court in which notice of possession has been filed:
(1) Sell any asset of the organization having a value in excess of five hundred dollars ($500);

(continued...)

-10-

[9] (...continued)
(2) Compromise or release any claim if the amount of the claim exceeds five hundred dollars ($500), exclusive of interest; or

(3) Make any payment on any claim, other than a claim upon an obligation incurred by the commissioner, before preparing and filing a schedule of the commissioner's determinations in accordance with this chapter.

(b) Within six (6) months of the commencement of liquidation, the commissioner may elect to terminate any executory contract under which the state bank has contracted either to receive or to provide services, such services specifically including advertising, or any obligation of the bank as a lessee. A lessor who receives sixty (60) days' notice of the commissioner's election to terminate the lease shall have no claim for rent other than rent accrued to the date of termination or for claims for damages for such termination.

(c) As soon after the commencement of liquidation as is practicable, the commissioner shall take the necessary steps to terminate all fiduciary positions held by the state bank and take such action as may be necessary to surrender all property held by the bank as a fiduciary and to settle its fiduciary accounts. Such fiduciary accounts may be transferred by the commissioner to another qualified corporate fiduciary as determined by the commissioner, and notice of such transfer must be given by registered mail to the parties by the transferee corporate

fiduciary.

(d) As soon after the commencement of liquidation as practicable, the commissioner shall send notice of the liquidation to each known depositor, creditor and lessee of a safe deposit box or bailor of property held by the bank at the address shown on the books of the institution. The notice shall also be published in a newspaper of general circulation in the community once a week for three (3) successive weeks. The commissioner shall send with the notice a statement of the amount shown on the books of the institution to be the claim of the depositor or creditor. The notice shall demand that property held by the bank as bailee or in a safe deposit box be withdrawn by the person entitled thereto and that claims of depositors and creditors, if the amount claimed differs from that stated in the notice to be due, be filed with the commissioner before a specified date not earlier than sixty (60) days thereafter in accordance with the procedure prescribed in the notice.

(e) Safe deposit boxes, the contents of which have not been removed before the date specified, shall be opened by the commissioner in the manner provided for boxes upon which the payment of rental is in default, and the sealed packages containing the contents and the certificates, together with any unclaimed property held by the bank as bailee and certified inventories thereof, shall be reported to the state treasurer who shall deal with them in accordance with the provisions of the Uniform Disposition of Unclaimed Property Act, compiled in title 66, chapter 29.

(f) Within six (6) months after the last day specified in the notice for the filing of claims or such longer period as may be allowed by the court in which notice of possession has been filed, the commissioner shall:

(1) Reject any claim if the commissioner doubts the validity thereof;

(2) Determine the amount, if any, owing to each known creditor or depositor and the priority class of the claim under this chapter and chapter 1 of this title;

(3) Prepare a schedule of the commissioner's determinations for filing in the court in which notice of possession was filed; and

(4) Notify each person whose claim has not been allowed in full and publish once a week for three (3) successive weeks a notice of the time when and the place where the schedule of determinations will be available for inspection and the date, not sooner than thirty (30) days thereafter, when the commissioner will file the schedule in court.

(g) Within twenty (20) days after the filing of the commissioner's schedule, any creditor, depositor or stockholder may file an objection to any determination made. Any objections so filed shall be heard

(continued...)

commissioner issued a Notice of Liquidation of Sentinel Trust Company.

Pursuant to T.C.A. § 45-2-1504(c), which requires the Commissioner to terminate all fiduciary positions held by Sentinel as soon as practicable, the Commissioner, through the appointed Receiver, sought to transfer the trustee and executor positions that Sentinel held on three personal trust accounts to new trustees or executors. On July 2, 2004, the Commissioner filed a motion seeking the approval of the Lewis County Chancery Court to transfer Sentinel's fiduciary positions on these three personal trust accounts, as well as to transfer all of the verified investments assets separately held by Sentinel on behalf of those accounts. Appellants did not object to the transfer, and an agreed order approving these transfers was entered by the Lewis County Court on July 19, 2004.

---

[9](...continued)
and determined by the court, upon such notice to the commissioner and interested claimants as the court may prescribe. If the objection is sustained, the court shall direct an appropriate modification of the schedule. After filing the schedule, the commissioner may, from time to time, make partial distribution to the holders of claims which are undisputed or have been allowed by the court, if a proper reserve is established for the payment of disputed claims. As soon as is practicable after the determination of all objections, the commissioner shall make final distribution.
(h)(1) The following claims shall have priority:

> 1. (A) Obligations incurred by the commissioner;
>
> (B) Wages and salaries of officers and employees earned during the three-month period preceding the commissioner's possession in an amount not exceeding six hundred dollars ($600) for any one (1) person;
>
> (C) Fees and assessments due to the department; and
> (D) Deposits to the extent of ten dollars ($10.00) for each depositor.
> (2) After the payment of all other claims with interest at the maximum rate permitted on time deposits, the commissioner shall pay claims otherwise proper which were not filed within the time prescribed.
> (3) If the sum available for any class is insufficient to provide payment in full, such sum shall be distributed to the claimants in the class pro rata.
> (I) Any assets remaining after all claims have been paid shall be distributed to the stockholders in accordance with their respective interests.
> (j) Unclaimed funds remaining after completion of the liquidation shall be transferred to the state treasurer to be dealt with in accordance with the provisions of the Uniform Disposition of Unclaimed Property Act, compiled in title 66, chapter 29.
> (k) When the assets have been distributed in accordance with this chapter and chapter 1 of this title, the commissioner shall file an account with the court. Upon approval thereof, the commissioner shall be relieved of liability in connection with the liquidation and the charter shall be canceled.

Next, the Commissioner and Receiver filed a motion seeking approval to transfer the fiduciary positions on Sentinel's remaining bond accounts not in default, and four defaulted bond accounts to successor fiduciaries. The Appellants filed an objection to this motion on November 12, 2004. Appellants argued that the Lewis County Chancery Court lacked subject matter jurisdiction to approve the transfer of the bond issues based on the Appellants' belief that the provisions of T.C.A. § 45-2-1504 applied only to state banks, not to trust companies. A hearing on the motion was held on November 15, 2004. The trial court granted the motion of the Commissioner and Receiver approving transfer of the bond issues, and the order was entered on November 15, 2004. Further, the trial court certified the order as a final appealable order, pursuant to Tenn. R. Civ. P. 54. On November 24, 2004, the Receiver filed an announcement informing the court that the parties had agreed to transfer of the fiduciary positions on the bond issues that had been reserved from the November 15, 2004, Order and requested entry of a final order approving such transfers. An order granting that request was entered by the Lewis County Chancery Court on December 1, 2004. The Appellants filed a Notice of Appeal from the Lewis County Chancery Court's order on December 10, 2004.

Prior to the finalization of the Lewis County Chancery Court's orders transferring the fiduciary positions on Sentinel's bond accounts, the Appellants filed a petition in Davidson County Chancery Court for a writ of supersedes and common law writ of certiorari, seeking judicial review of the Commissioner's decisions to take possession of, and to liquidate, Sentinel. The Appellants argued that the Commissioner had no authority to exercise his bank regulatory powers against Sentinel because the governing statutes allowing the Commissioner the power to take possession and liquidate applied solely to banks, not to trust companies. The writ of certiorari was issued on July 1, 2004.

On July 16, 2004, Appellants filed a motion requesting an expedited hearing only on the petition for writ of supersedeas. On July 16, 2004, the Commissioner filed a response to Appellants' motion stating that he had no objection to an expedited hearing on the writ of supersedeas and requested that the court also expedite a hearing on the writ of certiorari. On July 27, 2004, the Commissioner filed the Administrative Record, and a response to the Appellants' motions. The Commissioner asserted that he had acted with express statutory authority in taking possession of and liquidating Sentinel, and that there was substantial and material evidence in the record to support his decisions. On August 4, 2004, the Commissioner filed a supplemental response to the petition for supersedeas that included a transcript of the legislative history debates on Public Chapter 112, which the Commissioner asserted demonstrated the Legislature's understanding and intent that all the provisions of the Tennessee Banking Act would apply to state trust companies. Before a hearing could be held on the petition for writ of supersedeas, on July 30, 2004, Appellants filed a supplemental petition seeking mandamus and specifically requesting an order from the Davidson County Chancery Court directing the Commissioner to cease the ongoing liquidation of Sentinel under the jurisdiction of the Lewis County Chancery Court. The mandamus petition was abandoned by Appellant. At a hearing on August 5, 2004, the Davidson County Chancery Court offered to consolidate the hearing on the request for supersedeas with the writ of certiorari so that all issues before the court could be timely resolved.

The Appellants, however, were not willing to agree to a consolidated hearing and sought to proceed solely on the request for supersedeas,(based only upon the legal argument that the Commissioner was acting without statutory authority).  The Appellants sought the writ of supersedeas because "Sentinel Trust Company is not a bank, and has none of the characteristic attributes of a bank" and argued that the statutory powers the Commissioner exercised only apply to a bank and, therefore, the Commissioner acted "illegally" and "wholly outside his administrative and policing authority."   On August 9, 2004, the court issued an order denying the petition for writ of supersedeas.  The Davidson County Chancery Court order reads, in pertinent part, as follows:

> In 1999, the General Assembly amended the [Tennessee Banking] Act to specifically make trust companies subject to all of its provisions, not just those pertaining to fiduciaries.
>
> *          *          *
>
> [The] provisions of Chapter 112 make it clear the General Assembly's intent that all of Chapters 1 and 2 of Title 45 shall apply to the operation and regulation of state trust companies and that such companies shall fully comply and conform with all the provisions of these chapters.

The court did not make a finding as to the factual foundation supporting the decisions to take possession and liquidate, as such issues were not presented to the court.

On August 13, 2004, in the event that the Davidson County Court declined to vacate or revise its previous order, Appellants filed a motion with the Davidson County Chancery Court requesting that the court: (1) vacate or revise its August 9 order, (2) enter final judgment for Appellants upon both the writs of certiorari and supersedeas on the basis of the pleadings, (3) reserve to the Appellants the right to an evidentiary hearing, and (4) grant an immediate interlocutory appeal.  On August 24, 2004, the trial court issued an order denying the motion requesting the court to vacate or revise its August 9, 2004 order.  However, the trial court did grant Appellants permission to seek an interlocutory appeal pursuant to Rule 9 of the Tenn. R. App. P.  On August 27, 2004, Appellants filed an application for permission to appeal, and on application for extraordinary appeal.  On September 1, 2004, the Middle Section of the Tennessee Court of Appeals  issued an order dismissing both appeals.  The Order read,  in pertinent part, as follows:

> Having reviewed the application and supporting documents, we cannot conclude that an interlocutory appeal is necessary to prevent irreparable harm or to prevent needless, expensive and protracted litigation.  Nor can we conclude that the trial court has so far departed from the acceptable and usual course of judicial proceedings as to require immediate review under Tenn. R. App. P. 10.

-14-

Six months later, on March 4, 2005, the Appellants filed a motion with the Davidson County Chancery Court requesting that the case be transferred to the Lewis County Chancery court for hearing or, in the alternative, to set a scheduling conference so that a trial date could be set. After a status conference, the court issued an order setting a final hearing for March 29, 2005. The court further noted that, because this was a post-seizure hearing, it would be liberal in allowing the introduction of evidence in order to insure that the hearing fully complied with the concepts of due process, despite the fact that the Appellants had waited almost eight months post-seizure to seek a hearing challenging the Commissioner's actions. Following a two-day evidentiary hearing, the court issued a memorandum and order on April 13, 2005, in which it denied the petition for writ of certiorari and dismissed the case. The memorandum and order of the court reads, in pertinent part:

> This Court was always open and ready to grant the petitioners [Appellants] a prompt post-seizure and/or post liquidation notice hearing. The failure to have a prompt post-seizure hearing challenging the factual basis for the seizure was entirely the fault of the petitioners. Petitioners' counsel in August, 2004 insisted that his legal arguments were so strong that he did not need a hearing on the facts. He insisted on a hearing limited to his argument that the banking statutes did not apply to trust companies. . . . This insistence was pressed in the face of the Court's offer to give him a final hearing on all issues within 7-10 days of August 5, 2004. When petitioners lost their legal argument in state court, they were so sure of their position that they then went to federal court where they again lost.
>
> Finally, having failed to win on their legal argument, petitioners finally in March, 2005, ten (10) months after the Commissioner took possession, requested a hearing challenging the Commissioner's factual determinations.
>
> The Court continues to adhere to its decision expressed in its memorandum and order of August 9, 2004 that the banking statutes apply to trust companies and that the statutory structure allowing the Commissioner to take possession pursuant to T.C.A. § 45-2-1502(c)(1) and related statutes is constitutional.
>
>           *           *           *
>
> The factual challenge to the Commissioner's action has now been delayed so long by the petitioners that this case is now moot. See Boyce v. Williams, 389 S.W.2d 272, 277-78 (Tenn. 1965). The receivership and liquidation have proceeded now for eleven (11) months, and the record indicates that Sentinel is but an empty shell. While Humpty Dumpty could perhaps have been put back together in the Summer of 2004 [Sentinel] can no longer be put back together.

-15-

Furthermore, the court found that, if it were to reach the factual merits, it would affirm the actions of the Commissioner. The court stated that the facts support the conclusion of the Commissioner that an emergency existed, that the money in the pooled trust account belonging to the bond holders was in immediate danger, and that the record supported the Commissioner's decision to liquidate. The Appellants filed a Notice of Appeal from the Davidson County Chancery Court's order on April 19, 2005.

As part of the continuing liquidation of Sentinel, the Commissioner and Receiver filed a motion with the Lewis County Chancery Court on May 2, 2005, seeking an approval of the sale of the Sentinel Trust Bellevue, Tennessee property ("Bellevue Property"), pursuant to T.C.A. § 45-2-1504(a)(1). T.C.A. § 45-2-1504(a)(1) states that, in liquidating a state-chartered trust company, court approval would be needed to sell an asset of the trust company having a value of in excess of Five Hundred Dollars ($500). This property was titled in the name of Sentinel Trust Company and was being used as an office location for conducting the business of Sentinel. On May 26, 2005, Appellant Bates filed an objection to the sale, alleging again that the Commissioner lacked authority. The Lewis County Court held a hearing on May 26, 2005 and issued an order that same day granting the sale of the Bellevue Property and certified the order as final pursuant to Tenn. R. Civ. P. 54.02. Mr. Bates filed a Notice of Appeal on June 14, 2005, and the appeal was docketed in the court as a separate appeal from the pending Lewis County case. No motion for stay was filed with the court to postpone the sale, and, as a result, the sale of the Bellevue Property closed on July 8, 2005.

On appeal, the Appellants present several issues for review, which we have rephrased as follows:

> 1. Whether the Tennessee Banking Act is unconstitutional on its face by vesting in the Commissioner, a member of the Executive Branch of the government, powers which may be vested only in the judiciary, including the appointment of receivers, remove corporate directors, declare corporations insolvent?

> 2. Whether the trial court erred when it held that the Tennessee Banking Act applies to the trust companies and whether the Commissioner exceeded his jurisdiction or acted illegally in taking possession of Sentinel Trust Company?

> 3. Whether there exists substantial or material evidence in the record to support the Commissioner's decision to take possession of Sentinel Trust Company and subsequent decision to liquidate the company?

4.  Whether the chancery court properly issued orders approving a transfer of Sentinel's fiduciary positions to successor trustees?

5.  Whether, pursuant to the Tennessee Banking Act, the Commissioner had authority to retain the fiduciary positions as to defaulted bond issues, while transferring non-defaulted bond issues?

6.  Whether the commissioner has the authority to sell the Bellevue Property upon approval of the receivership court?

7.  Whether the receivership court erred in approving the sale of the Bellevue Property for $320,000?

8.  Whether the trial court erred when it denied the petition for a writ of certiorari, declaring the case moot?

In summary, the Appellants' primary arguments are that the Tennessee Banking Act does not apply to trust companies, and that the Commissioner exceeded his jurisdiction when he took possession of Sentinel Trust Company. The remaining issues are extensions of these primary questions.

1.  Whether the Tennessee Banking Act is unconstitutional on its face by vesting in the Commissioner, a member of the Executive Branch of the government, powers which may be vested only in the judiciary, including the appointment of receivers, remove corporate directors, declare corporations insolvent?

The Appellants assert that T.C.A. § 45-2-1502 violates the separation of powers provision of Art. II, § 2 of the Tennessee Constitution. Specifically, Appellants contend that the fact that the statute allows the Commissioner to place a trust company in receivership (and other such related duties) is a judicial power vested solely in the Courts of Tennessee. Appellants argue that the power to impose a receivership is, and has always been, one of the powers vested solely in the judicial branch of the Tennessee government, and that any statute that vests this power in any member of the executive or legislative departments is unconstitutional. The Commissioner argues that there is a distinct difference between the power to institute a court-created equity receivership and the power to institute an administrative receivership, and that the power to institute an administrative receivership is clearly one that is vested in the executive branch of government.

The Tennessee Constitution states that "[t]he powers of the government shall be divided into three distinct departments; the Legislature, Executive and Judicial," and that "[n]o person or

persons belong to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tennessee Constitution, art. II, §§ 1 and 2. In *Richardson v. Tennessee Board of Dentistry,* 913 S.W.2d 446 (Tenn. 1995), the Tennessee Supreme Court further defines the roles of the governmental branches stating that "[t]he legislative branch has the authority to make, alter, and repeal the law; the executive branch administers and enforces the law; and the judicial branch has the authority to interpret and apply the law." *Id.* at 453. While the departments of government have been characterized as "independent" and "co-equal," they have also been viewed as "interdependent" because their functions overlap. *Summers v. Thompson,* 764 S.W.2d 182, 189 (Tenn.1988); *State v. King,* 973 S.W.2d 586, 588 (Tenn.1998); *Underwood v. State,* 529 S.W.2d 45, 47 (Tenn.1975). As stated in *House v. Creveling,* 147 Tenn. 589, 250 S.W. 357 (Tenn. 1923), as a matter of practice, it has been found impossible to entirely preserve the theoretical lines between the three departments of government. Official powers are commonly conferred on administrative officers, boards and commissions. *Woods v. State,* 130 Tenn. 100,169 S.W. 558, 559 (Tenn. 1914). So, the fact that limited judicial or legislative power may be conferred upon an executive or administrative officer would not necessarily affect the validity of a statute. *See, e.g., Bank of Commerce & Trust Co. v. Senter,* 149 Tenn. 569, 260 S.W. 144, 151 (Tenn. 1924). A legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of the government. *Underwood v. State,* 529 S.W.2d at 47.

It is a fundamental rule of law that the departments, agencies, and commissions of government have no inherent or common-law power of their own. *General Portland, Inc. v. Chattanooga Hamilton County Air Pollution Control Bd.,* 560 S.W.2d 910, 914 (Tenn. Ct. App. 1976). They are purely creatures of statute. Accordingly, governmental agencies have only those powers expressly granted by statute and those powers required by necessary implication to enable them to fulfill their statutory mandate, and the statutes should be construed liberally since they are remedial in nature. *Sanifill of Tenn., Inc. v. Tennessee Solid Waste Disposal Control Bd.,* 907 S.W.2d 807, 810 (Tenn. 1995); *Tennessee Pub. Serv. Comm'n v. Southern Ry.,* 554 S.W.2d 612, 613 (Tenn. 1977). Actions taken by a governmental agency without the required authority are nullities. *Sanifill of Tennessee, Inc.,*907 S.W.2d at 810.

The General Assembly is empowered to confer on the Commissioner of the Tennessee Department of Financial Institutions only those judicial powers reasonably necessary as an incident to the accomplishment of the purposes for which the Department of Financial Institutions was created. The purpose of the "Tennessee Banking Act" is, *inter alia*, to provide for the sound conduct of the regulated businesses and the conservation of their assets. *See* T.C.A. § 45-1-102 (2000). The statute further provides:

(d) The purposes of this chapter and chapter 2 of this title shall constitute standards to be observed by the commissioner of financial institutions in the commissioner's exercise of authority under this chapter and chapter 2 of this title, and shall constitute rules of construction in all matters of construction and application of those chapters.

T. C. A. § 45-1-102(d).

T.C.A. § 45-2-1502 authorizes the Commissioner to take possession of a trust company if he finds that certain circumstances exist. Furthermore, the statute provides that, when the commissioner has taken possession of a trust company, "the commissioner shall be vested with the full and exclusive power of management and control, including the power . . . to appoint a receiver to have all of the rights, powers, duties and obligations granted to the commissioner in possession for the purpose of liquidation or reorganization, and to reorganize or liquidate the bank in accordance" with specific provisions of the Tennessee Banking Act. We find that the powers enumerated in T.C.A. § 45-2-1502 authorizing the Commissioner to appoint a receiver, to remove corporate directors, and the power to declare corporations insolvent are powers required to enable the Commissioner to fulfill his statutory mandate under T. C. A. § 45-1-102. The powers bestowed upon the Commissioner are limited to those judicial powers reasonably necessary as an incident to the accomplishment of the purposes for which the Department of Financial Institutions was created. Therefore, we find that T.C.A. § 45-2-1502 does not violate the separation of powers provision of Art. II, § 2 of the Tennessee Constitution.

2.      Whether the trial court erred when it held that the Tennessee Banking Act applies to the trust companies and whether the Commissioner exceeded his jurisdiction or acted illegally in taking possession of Sentinel Trust Company?

The trial court concluded that the Tennessee banking laws codified in Chapters 1 and 2 of Title 45 of the Tennessee Code apply to trust companies. In order to determine whether the trial court's conclusion was in error, we must delve into the construction of T.C.A. § 45-1-124, (and in particular the provisions of the 1999 amendments to that statute) and T.C.A. § 45-2-1502. The Tennessee Banking Act was first adopted by the Tennessee General Assembly in 1969. Originally, the Act only required that all state banks be operated in accordance with its provisions. However, in 1980, the General Assembly amended the Act to expand the scope of its application as follows:

Provided, however, a state bank or trust company whose purposes and powers are limited to fiduciary purposes and powers shall be subject only to the provisions pertaining to fiduciaries in Chapters 1 through 11 of this title and such other provisions of said chapters as the Commissioner determines are reasonably necessary for the sound operation of such banks or trust companies.

-19-

T.C.A. § 45-1-124 (1980).

In 1999, as discussed *supra*, the General Assembly again amended the Banking Act through the enactment of Public Chapter 112, which further revised T.C.A. § 45-1-124. Specifically, the General Assembly modified T.C.A. § 45-1-124(d) by adding the language and punctuation "trust companies." In addition, subsection (b) was completely modified, and subsections (e) through (h) were added. Following the 1999 Amendments, § 45-1-124 reads, as follows (with amendments in bold):

(a) The existence of state banks formed or existing on April 2, 1969, shall not be impaired by the enactment of this chapter and chapter 2 of this title, or by any change in the requirements for the formation of state banks, or by any amendment or repeal of the laws under which they were formed or created, and except as otherwise expressly provided in those chapters, the repeal of a prior act or acts by those chapters shall not affect any right accrued or established, or any liability or penalty incurred, under the provisions of such act, prior to the repeal thereof.

**(b) To the full extent consistent with such rights, liabilities, and penalties, all state banks and, to the extent applicable, all banks, shall hereafter be operated in accordance with the provisions of this chapter and chapter 2 of this title. Unless the commissioner determines otherwise, the provisions of chapters 1 and 2 of this title, and the rules thereof, shall also apply to the operation and regulation of state trust companies and banks whose purposes and powers are limited to fiduciary purposes and powers.**
(c) All powers granted in this chapter and chapter 2 of this title may be freely exercised by any corporation, which is empowered by its charter under any prior act of the general assembly and any amendments thereto, to exercise the rights and powers which appertain and belong to a banking institution or to conduct a general banking business, without the necessity of amending its charter, unless such charter expressly prohibits the exercise of such powers.

(d) Except to the extent inconsistent with or contrary to specific provisions of chapters 1, 2 and 3 of this title, Tennessee state banks, **trust companies,** savings and loan associations, and savings banks, and their directors, officers and shareholders shall be governed by and subject to the Tennessee Business Corporation Act, compiled in title 48, chapters 11-27, as the same may be amended from time to time, and successor statutes thereto. The commissioner has the authority to interpret the Tennessee Business Corporation Act as it applies to

financial institutions subject to regulation by the commissioner.

**(e) The charter of a trust company granted by the commissioner shall not be void due to the enactment of any amendment or repeal of the laws under which it was formed if such trust company is in operation, as determined by the commissioner, on July 1, 1999.**

**(f) A company engaged in activities subject to chapters 1 and 2 of this title, on July 1, 1999, but formed, as determined by the commissioner, prior to the enactment of Acts 1980, ch. 620, and not previously subject to regulation by the commissioner, may continue to act as a fiduciary without submitting an application. However, such entity shall be otherwise fully subject to chapters 1 and 2 of this title.**

**(g) A company authorized by its charter, prior to the enactment of Acts 1980, ch. 620, to engage in fiduciary activities, but not engaging in fiduciary activities on July 1, 1999, must file the appropriate application to establish a trust company and then fully comply with chapters 1 and 2 of this title.**

**(h) All state trust companies operating on July 1, 1999, shall have such period of time as the commissioner determines to be reasonable and prudent to conform to the requirements of chapters 1 and 2 of this title and the regulations thereunder, but such period shall not exceed three (3) years from July 1, 1999. During this period of time, to conform to the requirements of chapters 1 and 2 of this title, the commissioner may conduct examinations at such company's expense, and apply the requirements of chapters 1 and 2 of this title as deemed appropriate.**

T. C. A. § 45-1-124 (1999). *See also* Public Acts Ch. 112.

It is well settled that the interpretation of statutory law is a judicial function. *See, e.g., State ex rel. Comm'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 754 (Tenn. Ct. App.2001) (citations omitted). When interpreting a statute, the role of the Court is to "ascertain and give effect to the legislative intent." *Sharp v. Richardson*, 937 S.W.2d 846, 850 (Tenn. 1996). In the absence of ambiguity, legislative intent is derived from the face of the statute, and the Court may not depart from the "natural and ordinary" meaning of the statute's language. *Davis v. Reagan*, 951 S.W.2d 766, 768 (Tenn. 1997); *Westland West Community Assoc. v. Knox County*, 948 S.W.2d 281, 283 (Tenn. 1997).

The Appellants argue that, because the General Assembly did not add the designation "trust companies" in each individual section of Chapters 1 and 2 of Title 45, when it amended the statute in 1999, that trust companies are only subject to the Commissioner's regulation where "trust company" is expressly included or under those provisions pertaining specifically to fiduciaries. Appellants assert that "no statute provides that the term 'bank' includes 'trust company' with reference to any other provisions of the Tennessee Banking Act." Therefore, Appellants argue that the Commissioner has no authority to exercise any of his "bank regulatory powers" against Sentinel, a non-banking trust company. Specifically, the Appellants contend that, because  T.C.A. § 45-2-1502[10] (which authorizes the Commissioner to take possession of a "state bank" in certain circumstances) does not include the term "trust company," the Commissioner has no authority to take possession of a trust company under the statute . Consequently, Appellants assert that the Commissioner exceeded his jurisdiction, or acted illegally, when he took possession of Sentinel pursuant to the provisions of T.C.A. § 45-2-1502.

The Commissioner argues that the Appellants misconstrue the clear and complete language of  T.C.A. § 45-1-124, and instead ask this Court to focus solely on the definition of "state bank" to the exclusion of all other provisions. The Commissioner argues that the intent of the General Assembly is clearly  set forth in Public Chapter 112, T.C.A. § 45-1-124, which states that "***the provisions of Title 45, Chapters 1 and 2 and the rules thereof shall also apply to the operation and regulation of state trust companies*** and banks whose purposes and powers are limited to fiduciary purposes and powers" (emphasis added). Because T.C.A. § 45-2-1502 is a provision contained within Chapter 2 of Title 45, the Commissioner asserts that the statutory language applies to the operation and regulation of Sentinel.

The trial court found that the provisions of Chapter 112 "make it clear the General Assembly's intent that all of Chapters 1 and 2 of Title 45 shall apply to the operation and regulation of state trust companies and that such companies shall fully comply and conform with all the provisions of these chapters, not just the provisions pertaining to fiduciary activities." We agree with the trial court's determination. We find that the statute is not ambiguous and that the Legislature's intent to bring state trust companies under the umbrella of the Tennessee Banking Act is clear from the plain and ordinary meaning of the statutory language. *See* T.C.A. § 45-1-124(b) and (d). Moreover, the addition of  T.C.A. § 45-1-124(h) granting "all state trust companies operating . . . a period of time as the commissioner determines to be reasonable and prudent to conform to the requirements of chapters 1 and 2 of this title and the regulations thereunder" is further evidence of the Legislature's intent to expand the reach of the Tennessee Banking Act to encompass trust companies. Therefore, T.C.A. § 45-2-1502, which authorizes the Commissioner to take possession of a state bank under certain circumstances, also vests in

---

[10]  For the complete text of T.C.A. § 45-2-1502, *see supra* note 7.

the Commissioner the full authority to take possession of a Tennessee trust company under the same set of circumstances.[11]

3.      Whether there exists substantial or material evidence in the record to support the Commissioner's decision to take possession of Sentinel Trust Company and subsequent decision to liquidate the company?

The Commissioner took emergency possession of Sentinel on May 18, 2004.  Appellants argue that the financial condition of Sentinel was not sufficiently impaired to warrant the Commissioner's action.   Specifically, Appellants argue that there was no risk of serious losses to the depositor.  Because emergency possession was allegedly not warranted, the Appellants contend that the Commissioners actions denied Appellants their right to a pre-possession hearing.

T.C.A. § 45-1-1502(a) provides that the Commissioner may take possession of a state bank or trust company if he finds one of the following four criteria are met:

> (1) Its capital is impaired or it is otherwise in an unsound condition;
> (2) Its business is being conducted in an unlawful or unsound manner;
> (3) It is unable to continue normal operations; or
> (4) Its examination has been obstructed or impeded.

The Commissioner may take emergency possession of a state bank or trust company, without a preliminary hearing, if the additional criterion stated in T.C.A. § 45-1-1502(c)(1) exists :

> If, in the opinion of the commissioner, an emergency exists which will result in serious losses to the depositors, the commissioner may take possession of a state bank without a prior hearing. Any person aggrieved and directly affected by this action of the commissioner may have a review by certiorari as provided in title 27, chapter 9.

The writ of certiorari is not available as a matter of right; its grant or denial is within the sound discretion of the trial court, and will not be reversed on appeal unless there is abuse of that discretion. *Boyce v. Williams,* 389 S.W.2d 272, 277 (Tenn. 1965).  Further, the scope of review under the common law writ of certiorari is very narrow.  It does not involve an inquiry into the intrinsic correctness of the decision of the tribunal below, but only into the manner in which the decision was reached.   T.C.A. § 27-8-101.  *See, also, Robinson v. Clement,* 65 S.W.3d 632, 635 (Tenn. Ct. App. 2001) (citing *Arnold v. Tennessee Bd. of Paroles,* 956 S.W.2d 478, 480 (Tenn.

---

11

In the absence of ambiguity, as in the present case, legislative intent is derived from the face of a statute, and the Court may not depart from the "natural and ordinary" meaning of the statute's language.  However, we have reviewed the legislative history of Public Chapter 112 and find that the intent of the legislature expressed therein fully supports the interpretation as expressed by the trial court and this Court on review.

1997)); *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d 274, 277 (Tenn.1980)*; 421 Corp. v.. Metropolitan Gov't,* 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000); *Hoover, Inc. v. Metropolitan Bd. Of Zoning Appeals,* 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996)*; Powell, v. Parole Eligibility Review Bd.,* 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994). Thus, in the case at bar, under the standard of review for the common law writ, if there is substantial or material evidence in the record to support the existence of any one of the conditions set out in T.C.A. § 45-1-1502(a), and if there is also sufficient evidence that an emergency existed, which would have resulted in serious losses to the depositors, then the Commissioner's decision to take possession of Sentinel will be upheld.

In its "Notice of Possession of Sentinel Trust Company" filed with the Chancery Court of Lewis County on May 18, 2004, the Commissioner provided the following as a basis for the possession of Sentinel:

1.  Sentinel Trust Company ("Sentinel") is a Tennessee corporation engaged in fiduciary activities and subject to regulation by the Commissioner under the Tennessee Banking Act pursuant to Tenn. Code Ann. § 45-1-124.

2.  On May 3, 2004, the Commissioner issued an Emergency Order directing Sentinel to cease and desist from engaging in unsafe and unsound banking practices. That Order found that Sentinel had used pooled fiduciary funds to provide operating capital for non-related defaulted bond issues, thereby creating a fiduciary cash shortfall that greatly exceeds Sentinel's current operating capital and that Sentinel had failed to reconcile fiduciary cash and corporate cash accounts in a timely and accurate fashion and to keep accurate books and records.

3.  Efforts to infuse sufficient capital have been unsuccessful. Sentinel's potential liability for the cash shortfall in the pooled fiduciary account exceeds its current capital level. Furthermore, Sentinel has been unable to provide the Tennessee Department of Financial Institutions with a capital plan as required by the Emergency Cease and Desist Order to demonstrate how Sentinel could make the pooled fiduciary account whole.

Accordingly, the Commissioner took possession of Sentinel based upon the existence of the condition stated in T.C.A. § 45-1-1502(a)(1), that being Sentinel's business was being conducted in an unsound manner. Specifically, the record reflects that Sentinel used pooled fiduciary funds to provide operating capital for non-related, defaulted bond issues, thereby creating a fiduciary cash shortfall that greatly exceeded Sentinel's current operating capital. Even Sentinel's own counsel conceded that Sentinel's practice of funding defaulted bond

expenses with funds from other non-related bond issues was "inappropriate." On April 30, 2004, Mr. Bates, by his own admissions, stated that his calculations showed that Sentinel had a deficit fiduciary cash position of approximately $7.25 million. The record reflects that, as early as the Department's report for Sentinel's year ending December 31, 1999, the trust company had failed to reconcile fiduciary cash and corporate accounts in an accurate fashion and to keep accurate books and records in accordance with industry standards and Department regulations. Additionally, Sentinel had failed to submit a capital plan outlining the company's plans to replenish the fiduciary pooled account, and had failed to make an initial infusion of $ 2 million in capital by the May 17 deadline, as required by the Emergency Cease and Desist Order filed on May 3, 2004.

In their arguments, Appellants never deny that the above conditions existed at the time the Commissioner took possession of Sentinel. Rather, Appellants admit that Sentinel's practice of borrowing monies on deposit in the pooled fiduciary account from non-related bond issues to fund the expenses of defaulted bond issues resulted in a significant deficiency in cash in the pooled fiduciary account. Moreover, Mr. Bates specifically admitted that he used the total cash held by the trust department (i.e. monies deposited in trust to be used for the purposes specified in the indenture) in a manner that was contrary to the indentures that governed Sentinel's actions as trustee. By their own admissions, prior to the Commissioner's taking possession of Sentinel, Appellants were engaging in practices that not only violated the Tennessee Banking Act, but also violated the FDIC's Statement of Principles of Trust Department Management, which Sentinel adopted as part of its corporate policies. Furthermore, these practices violated the indentures and contractual agreements between the bond issuers and Sentinel as fiduciary. From the record before us, we conclude that there is ample material evidence to indicate that Sentinel's business was being conducted in an unsound manner. Consequently, the actions of the Commissioner in taking possession of Sentinel on May 18, 2004 were justified.

We now turn to the question of whether there is sufficient material evidence in the record to support the Commissioner's decision to take emergency possession of Sentinel without a prior hearing pursuant to T.C.A. §45-2-1502(c)(1). The statute states that, when "an emergency exists which will result in serious losses to the depositors, the commissioner may take possession of a state bank without a prior hearing." The Appellants argue that the Commissioner lacked authority to take possession of Sentinel under the emergency status for two reasons. First, because Sentinel is not a "bank" and, secondly, because Sentinel does not have any "depositors." Based upon the foregoing discussion, Appellants' argument that a trust company is not a bank and may not be substituted in the Tennessee Banking Act for a bank is misplaced. As discussed, *supra*, chapters 1 and 2 of the Tennessee Banking Act also apply to trust companies. Therefore, T.C.A. § 45-2-1502, which authorizes the Commissioner to take possession of a state bank under certain circumstances, also vests in the Commissioner the full authority to take possession of a Tennessee trust company under those same set of circumstances. Under T.C.A. § 45-2-1502, the question is whether there is sufficient material evidence in the record, from which we may conclude that potential for a serious loss to depositors existed. With deficits in Sentinel's pooled fiduciary account in excess of $7 million, bond issuers were certainly at risk of serious losses.

We find that sufficient material evidence exists to support the Commissioner's decision to take emergency possession of Sentinel Trust Company.

We must also determine whether there is sufficient material evidence in the record to support the Commissioner's decision to liquidate Sentinel. While T.C.A. § 45-2-1502 sets out the specific grounds that must be met in order for the Commissioner to take possession of a bank or trust company, the statute does not enumerate criteria that must be met before the Commissioner may or should , liquidate. Rather, T.C.A. § 45-2-1502 (b)(2) leaves the decision of liquidation to the discretion of the commissioner, to wit:

> When the commissioner has taken possession of a state bank, the commissioner shall be vested with the full and exclusive power of management and control, including the power to continue or to discontinue the business, to stop or to limit the payment of its obligations, to employ any necessary assistants, to execute any instrument in the name of the bank, to commence, defend and conduct in its name any action or proceeding in which it may be a party, to terminate the commissioner's possession by restoring the bank to its board of directors, to appoint a receiver to have all of the rights, powers, duties and obligations granted to the commissioner in possession for the purpose of liquidation or reorganization, and to reorganize or liquidate the bank in accordance with §§ 45-2-1503 and 45-2-1504. As soon as practicable after taking possession, the commissioner shall make an inventory of the assets and file a copy thereof with the court in which the notice of possession was filed.

T. C. A. § 45-2-1502 (b)(2).

This Court's scope of review is the same as in the trial court: to review the findings of fact of the Commissioner upon the standard of substantial and material evidence. *DePriest v. Puett,* 669 S.W.2d 669, 673 (Tenn. Ct. App. 1984). The evidence before the Commissioner must be such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Pace v. Garage Disposal Dist.,* 390 S.W.2d 461, 463 (Tenn,. 1965).

Department representatives and the Receiver submitted a preliminary report on June 15, 2004, which indicated that Sentinel had a fiduciary cash deficiency ranging between $7.6 and $8.4 million. Further, the report indicated that Sentinel was operating at a net loss and was insolvent at least in the amount of $6.2 million. The findings in the reports, coupled with the fact that the Sentinel Board of Directors and officers had no viable plan for infusion of capital, support the Commissioner's determination that liquidation of the company was necessary.

Despite the fiduciary cash deficiency, Appellants argue that the trust company was not insolvent at that time of liquidation. However, the evidence strongly preponderates against the Appellants' depiction of the stability of Sentinel at the time the Commissioner decided to liquidate the trust company. The record reflects that Mr. Bates himself confirmed that the pooled fiduciary account had a cash deficiency of $5,789,011 as of December 31, 2003 and a deficiency of approximately $7.25 million as of April 30, 2004. Given the fact that Sentinel's net worth was $1.3 million, the extent of the cash deficiency was itself sufficient evidence for the Commissioner to determine that liquidation was necessary and appropriate. Moreover, the record contains additional evidence to support a decision to liquidate. Sentinel's fee revenues were not sufficient to cover the operating expenses of the company. This resulted in a net loss of $163,501 for the first four months of 2004. The trust company did not maintain monetary reserves to correspond to the risk associated with the fiduciary activities they had undertaken. Furthermore, Sentinel had no formal or written business plan to guide them, nor any means to provide for a infusion of capital. The evidence before the Commissioner of an admitted multi-

million fiduciary cash deficiency well in excess of Sentinel's net worth, the company's poor

earning performance, the lack of any reserve in relation to losses, current operation at a net loss,

and no plan or means of how the company would eliminate the deficiencies, provide a sound

basis for the Commissioner's decision to liquidate Sentinel.

4.      Whether the chancery court properly issued orders approving a transfer of Sentinel's fiduciary positions to successor trustees?

Appellants challenge the validity of the orders approving the transfer of Sentinel's fiduciary positions to successor trustees on several grounds. First, Appellants argue that the Tennessee Banking Act does not authorize the Commissioner or the courts to transfer assets of trust companies, only state banks. As discussed, *supra*, the provisions of Public Chapter 112 clearly indicate the General Assembly's intent that all of Chapters 1 and 2 of Title 45 of the Tennessee Code apply to the operation and regulation of state trust companies. In particular, T.C.A. § 45-2-1504(c) states that, after commencement of the liquidation of a financial institution, "the Commissioner **shall** take the necessary steps to terminate all fiduciary positions held by [the institution]." (emphasis added). Specifically, the statute states that such "fiduciary accounts may be transferred by the commissioner to another qualified corporate fiduciary. . . ." T.C.A. § 45-2-1504(c). Consequently, the plain language of T.C.A. § 45-2-1504(c) authorizes the Commissioner to transfer Sentinel's fiduciary positions to successor trustees.

The Appellants next assert that the Tennessee Banking Act is unconstitutional in that it violates the separation of powers requirement of the Tennessee Constitution. However, as discussed, *supra*, the powers bestowed upon the Commissioner by this statute are limited to those judicial powers reasonably necessary to the accomplishment of the purposes for which the

Department of Financial Institutions was created. Consequently, T.C.A. § 45-2-1504 does not violate the separation of powers provision of Art. II, § 2 of the Tennessee Constitution.

Finally, the Appellants argue that the Tennessee Banking Act simply does not give the Lewis County Chancery Court jurisdiction "to permit or forbid the transfer of trust assets," including the removal and appointment of substitute trustees. Based upon this assertion, the Appellants contend that the Lewis County Chancery Court's orders approving the transfer of Sentinel's fiduciary positions are void for lack of jurisdiction.

Once the Commissioner determines that liquidation of a financial institution is necessary, such liquidation is governed by the provisions of T.C.A. § 45-2-1504. Under the statute, the Commissioner is authorized to do any of the following:

> (1) Sell any asset of the organization having a value in excess of five hundred dollars ($500);
> (2) Compromise or release any claim if the amount of the claim exceeds five hundred dollars ($500), exclusive of interest; or
> (3) Make any payment on any claim, other than a claim upon an obligation incurred by the commissioner, before preparing and filing a schedule of the commissioner's determinations in accordance with this chapter.

T.C.A. § 45-2-1504(a). However, before taking any of the enumerated actions, the Commissioner, under subsection (a), must obtain approval of the court in which the notice of possession has been filed.

T.C.A. § 45-2-1504(c) further requires the Commissioner to take the following action:

> As soon after the commencement of liquidation as is practicable, the commissioner shall take the necessary steps to terminate all fiduciary positions held by the state bank and take such action as may be necessary to surrender all property held by the bank as a fiduciary and to settle its fiduciary accounts. Such fiduciary accounts may be transferred by the commissioner to another qualified corporate fiduciary as determined by the commissioner, and notice of such transfer must be given by registered mail to the parties by the transferee corporate fiduciary.

Appellants argue that because subsection (c) does not require the Commissioner to seek court approval in the termination of fiduciary positions, the Lewis County Chancery Court had no authority to approve the transfer of Sentinel's fiduciary positions. However, the Appellants construction of the statute ignores the dictates set forth in subsection (a). This section not only permits, but also

requires the court's approval before the Commissioner may "sell any asset of the organization having a value in excess of five hundred dollars." The transfer of Sentinel's fiduciary positions represents a transfer of Sentinel's right to receive, among other revenue, trustee administration fees and paying agent fees. The record indicates that the Appellants themselves characterize the rights to receive these fees as an asset in excess of $4 million. For the foregoing reasons, the Lewis County Chancery Court had clear statutory authority to rule upon the Commissioner's motion to transfer Sentinel's fiduciary positions to successor fiduciaries.

5.      Whether, pursuant to the Tennessee Banking Act, the Commissioner had authority to retain the fiduciary positions as to defaulted bond issues, while transferring non-defaulted bond issues?

Appellants challenge the transfer of Sentinel's fiduciary positions to successor trustees on the grounds that such transfers must include all of Sentinel's fiduciary positions , as opposed to just the non-defaulted bond issues. Because the Appellants did not raise this issue in the trial court, it will not be considered on appeal. It is well settled that issues not presented to the trial court may not be presented for the first time on appeal. *Smith v. Harriman Util. Bd.,* 26 S.W.3d 879, 887 (Tenn. Ct. App. 2000). This Court has appellate jurisdiction only. *Foley v. Dayton Bank & Trust,* 696 S.W.2d 356, 359 (Tenn. Ct. App. 1985) (citing T.C.A. § 16-4-108 (1980)). Consequently, this Court may only decide issues which were brought to the attention of the trial judge, "and acted upon or pretermitted by him." *Clement v. Nichols,* 209 S.W.2d 23, 24 (Tenn.1948). The record before this Court contains no indication that this issue proffered by the Appellants in this appeal was raised to the trial court below. However, even if we were to address this issue, we note that the plain language of T.C.A. § 45-2-1504(c) does not require that the Commissioner transfer all of an organization's fiduciary positions, only that the Commissioner "take all necessary steps to terminate all fiduciary positions" held by the organization.

6.      Whether the commissioner has the authority to sell the Bellevue Property upon approval of the receivership court?

Appellants challenge the authority of the Commissioner to sell Sentinel's Bellevue Property on several grounds. First, Appellants argue that the Tennessee Banking Act does not authorize the Commissioner or the Receiver to sell assets of trust companies, only state banks. As stated, *supra*, the provisions of Public Chapter 112 indicate the General Assembly's intent that all of Chapters 1 and 2 of Title 45 of the Tennessee Code apply to the operation and regulation of state trust companies. T.C.A. § 45-2-1504 outlines the process for liquidating a financial institution under the Tennessee Banking Act. The statute specifically states that the Commissioner may sell **any** asset of the organization. T.C.A. § 45-2-1504(a) (emphasis added). Consequently, the Commissioner, and his appointed Receiver, were authorized, under to T.C.A. § 45-2-1504, to sell Sentinel's Bellevue Property upon approval of the receivership court.

Again, Appellants assert that the Tennessee Banking Act is unconstitutional in that it violates the separation of powers requirement of the Tennessee Constitution by granting the Commissioner the power to appoint a receiver and liquidate assets of a trust company. Appellants contend that, because the Tennessee Banking Act vests in the Commissioner (a member of the Executive branch of the state government) powers that allegedly may be vested only in the judiciary, the Act is unconstitutional. However, as discussed *supra*, the powers bestowed upon the Commissioner are limited to those judicial powers reasonably necessary to the accomplishment of the purposes for which the Department of Financial Institutions was created. Therefore, T.C.A. § 45-2-1504 does not violate the separation of powers provision of Art. II, § 2 of the Tennessee Constitution.

7.      Whether the receivership court erred in approving the sale of the Bellevue Property for $320,000?

Appellants contend that trial court erred in approving the sale of Sentinel's Bellevue Property. Specifically, Appellants assert that the $320,000 price approved by the receivership court was below the fair market price, and that the court should have "requir[ed] an appraisal at market value." However, the Appellants present no evidence to support a finding that the fair market value of the property is anything other than the $320,000 for which it was sold. The Appellants merely argue that the sale was a "forced sale" and should not have been approved. The Commissioner and Receiver state that the sale of the Bellevue was not a forced sale. The evidence supports the Commissioner and Receiver's position that it was a full list value sale at a fair market value set by a reputable real estate agent. In particular, the $320,000 list price for the Bellevue Property was set by a Nashville real estate agent after review of comparables, property condition, and property location. The property was listed for six months prior to its sale, and the property had a tax assessment value of $291,000.

Next, the Commissioner and Receiver assert that they are not prevented, in liquidating assets, from seeking and gaining court approval of the sale of an asset simply because the Appellants' expectations of what a fair market value might bring was not obtained from the sale transaction. T.C.A. § 45-2-1504 outlines the process that the Commissioner must follow in order to liquidate a financial institution. T.C.A. § 45-2-1504(a) states that the "commissioner may exercise any power of the office of commissioner, but shall not, without the approval of the court in which notice of possession has been filed (1) sell any asset of the organization having a value in excess of five hundred dollars." T.C.A. § 45-2-1504(a)(1). This is the only restriction placed upon the Commissioner or his appointed Receiver in the execution of a sale of a financial institutions assets. The Appellants are attempting to prevent the receivership court from approving a sale of assets, without proof that the sale price is one equivalent to a "fair market value." This requirement simply does not exist in the statute. Nonetheless, the question is moot because the record reflects that the sale of the Bellevue Property for $320,000 was a fair and reasonable amount.

8.   Whether the trial court erred when it denied the petition for a writ of certiorari, declaring the case moot?

On April 13, 2005, the Davidson County Chancery Court denied the Appellants' petition for writ of certiorari and declared the case moot. The trial court's order, filed the same day, reads in pertinent part, as follows:

> This Court was always open and ready to grant the petitioners [Appellants] a prompt post-seizure and/or post -liquidation notice hearing. The failure to have a prompt post-seizure hearing challenging the factual basis for the seizure was entirely the fault of the petitioners. Petitioners' counsel in August, 2004 insisted that his legal arguments were so strong that he did not need a hearing on the facts. He insisted on a hearing limited to his argument that the banking statutes did not apply to trust companies. . . . This insistence was pressed in the face of the Court's offer to give him a hearing on all issues within 7-10 days of August 5, 2004. When petitioners lost their legal argument in state court, they were so sure of their position that they then went to federal court where they again lost. Finally, having failed to win on their legal argument, petitioners finally in March 2005, ten (10) months after the Commissioner took possession, requested a hearing challenging the Commissioner 's factual determinations.
>
> *           *           *
>
> The factual challenge to the Commissioner's action has been delayed so long by the petitioners that this case in now moot. . . . The receivership and liquidation have proceeded now for eleven (11) months, and the record indicates that Sentinel is but an empty shell. While Humpty Dumpty could perhaps have been put back together, in the Summer of 2004 [Sentinel] can no longer be put back together.

The Appellants assert that because "[t]here is in this record no evidence that any of Sentinel's assets have been conveyed away beyond redemption," this Court can reverse the trial court's approval of Sentinel's liquidation. Appellants seek an order from this Court directing the Commissioner to return Sentinel to its status as of May 18, 2004 (i.e. prior to possession by the Commissioner).

Our analysis is guided by our Supreme Court's decision in *Boyce v. Williams,* 389 S.W. 2d 272 (Tenn. 1965). In *Boyce,* following the merger of a domestic insurance company with a foreign company, the insurance company's stockholders filed a petition for the common law writ of certiorari to vacate the Commissioner of Insurance's approval of the merger, that the merger

be enjoined and the assets of the two corporations be segregated. The petition alleged that the commissioner was without authority to approve the merger. The trial court dismissed the petition upon finding that the commissioner had not exceeded his jurisdiction or acted illegally. Upon review, the Tennessee Supreme Court addressed the question of whether an effectual relief could be granted well after the companies had merged and assets had been transferred, to wit:

> Should we now grant the relief sought and remand the case to the trial court for trial it would only amount to further delay.
>
> University has now been merged with a foreign corporation and we dare say most, if not all, its assets are in a foreign state and out of the jurisdiction of the courts of this state.
>
> Thus, the courts of this state cannot grant to appellants any effectual relief and to now remand the case for a trial would be a useless gesture on our part. The question of whether the commissioner's approval of the merger should be vacated or whether appellants are entitled to an injunction and a segregation of the assets of University as prayed for in the petition have become moot.
>
>        *       *       *
>
> Where it appears the act to be enjoined has been consummated, an action for an injunction presents only a moot question and will be dismissed

*Boyce,* 389 S.W.2d 272, 277–278 (citations omitted). The Appellants argue that *Boyce* is but "an anomaly – it should not be taken as an inspiration to intentionally repeat ancient mistakes." We disagree. *Boyce v. Williams* is well-settled precedent that the courts of Tennessee have relied upon in defining their scope of jurisdiction and is, in fact, directly analogous to the case at bar.

When the trial court denied the Appellants' petition for writ of certiorari and declared the case moot, the receivership and liquidation had been under way for eleven months, and all but four of Sentinel's defaulted bond issues had been transferred to successor trustees. As the trial court stated, Sentinel was in essence an empty shell. Furthermore, the failure to promptly have a post-seizure hearing challenging the factual basis for the seizure was entirely the fault of the petitioners. As stated in *Boyce*:

> The rule is well established that review proceedings are not allowed for the purpose of setting abstract questions, but only to correct errors injuriously affecting the rights of some party to the litigation. Accordingly, an appeal or error proceeding will be dismissed if the question presented by it . . . has

become moot or academic or if, . . . an event has occurred which makes a determination of it unnecessary or renders it impossible for an appellate court to grant effectual relief.

*Boyce,* 389 S.W.2d 272, 278 (citations omitted). By the time the factual hearing occurred in late March, 2005, the ongoing liquidation of Sentinel and transfer of Sentinel's assets made it impossible for the court to grant effectual relief. Consequently, we find that the Davidson County Chancery Court did not err in denying the petition for a writ of certiorari and in declaring the case moot.

Accordingly, and for the foregoing reasons, the final orders of the respective trial courts are affirmed. Costs of these appeals are assessed to the Appellants, Danny N. Bates, Clifton T. Bates, Howard H. Cochran, Gary L. O'Brien, and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.