IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 17, 2008 Session

## COLEMAN MANAGEMENT, INC.
v.
## DAVID MEYER, JAMES W. RAYNER, RICHARD D. BAKER, ROSE McKEE, AND NCF ASSOCIATES

**An Appeal from the Circuit Court for Shelby County**
**No. CT-001289-02      Rita L. Stotts, Judge**

_____

**No. W2007-02497-COA-R3-CV - Filed April 22, 2009**

_____

This is an action to recover a real estate commission. The defendants are the general partners of a partnership that owned a single asset, an apartment complex. In 1992, the partnership filed a reorganization petition in bankruptcy. The partnership hired the plaintiff real estate agency to sell the apartment complex while it was in bankruptcy. After a hearing to establish the value of the property, the bankruptcy court permitted the partnership to buy back the property for $9.8 million. Soon after the bankruptcy plan was confirmed, however, the partnership, through the plaintiff real estate agency, contracted to sell the property to a third party for $12.5 million. Upon discovering this, the bankruptcy court permitted the sale to the third party to take place for $12.5 million, but it ordered that the excess proceeds of the sale be placed in escrow. When the escrow funds were released, the plaintiff real estate agency did not receive its commission on the sale of the property. Consequently, the real estate agency filed this lawsuit against the general partners to recover its commission. The defendants filed a motion to dismiss based on the statute of limitations and on the equitable doctrine of "unclean hands." The trial court denied the motion and awarded the plaintiff real estate agency the commission sought plus prejudgment interest. The defendants now appeal. We affirm, finding that the lawsuit was timely filed, that the trial court did not err in declining to apply the unclean hands doctrine, and that the trial court did not abuse its discretion in awarding prejudgment interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Dan Warlick, Nashville, Tennessee,[1] for the Defendant/Appellants, David Meyer, James W. Rayner, Richard D. Baker, Rose McKee, and NCF Associates.

_____

[1]Mr. Warlick did not represent the appellants at the trial below.

John S. Golwen, Kristen C. Wright, and Tiffany A. Yates, Memphis, Tennessee, for the Plaintiff/Appellee, Coleman Management, Inc.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendants/Appellants David Meyer, James W. Rayner, Richard D. Baker, Rose McKee, and NCF Associates were the general partners of Tenn-Fla Partners ("Tenn-Fla"). The only asset owned by Tenn-Fla was an apartment complex in Orlando, Florida, known as Lakeside North at Altamonte Mall ("the Lakeside property"). The issue in this case is whether Plaintiff/Appellee Coleman Management, Inc. ("Coleman Management"), a real estate agency, through the efforts of its owner, Harry Ray Coleman ("Mr. Coleman"), is entitled to a commission on the sale of the Lakeside property that took place shortly after Tenn-Fla filed for chapter 11 bankruptcy protection.

### A. Background[2]

Tenn-Fla acquired the Lakeside property in 1984 for a purchase price of about $5 million in cash and the assumption of $12.7 in debt. In November 1989, Tenn-Fla refinanced the first mortgage on the property through tax-exempt bond financing issued by the Florida Housing Finance Agency. First Union National Bank of Florida ("First Union") became the trustee for the holders of the publicly traded bonds ("bondholders"). The bonds were in the amount of $12,685,000. Thereafter, in the wake of a general economic downturn in the Orlando real estate market, the general partners of Tenn-Fla personally borrowed $2.5 million from First Tennessee Bank in Memphis, Tennessee, which was contributed towards Tenn-Fla's operational expenses.[3]

Tenn-Fla found itself forced to contemplate bankruptcy. On July 1, 1992, Tenn-Fla executed a management agreement with Coleman Management to manage the Lakeside property and to sell it in bankruptcy. In that agreement, Tenn-Fla agreed to pay Coleman Management a 2% commission upon the completion of the sale of the Lakeside property.

On July 17, 1992, Tenn-Fla filed a chapter 11 reorganization petition in the United States Bankruptcy Court for the Western District of Tennessee ("Bankruptcy Court"). The schedules filed by Tenn-Fla in the bankruptcy proceedings listed the Lakeside property as its only substantial asset

---

[2]The background facts of this case are described in more detail in the decision issued by the Bankruptcy Court, *First Union Nat'l Bank v. Tenn-Fla Partners (In re Tenn-Fla Partners)*, 170 B.R. 946 (Bankr. W.D. Tenn. 1994), and the appellate courts involved in the case, 226 F.3d 746 (6th Cir. 2000); 229 B.R. 720 (W.D. Tenn. 1999).

[3]The amended disclosure statement filed in the bankruptcy court asserted that the general partners of Tenn-Fla had contributed and invested $8.6 million in the Lakeside property.

and assigned the property an estimated fair market value of $8.5 million.[4]  Tenn-Fla authorized Mr. Coleman to act on behalf of the partnership in the bankruptcy proceedings, including the authority to sign the bankruptcy petition, disclosure statements, and reorganization plans.  *See First Union Nat'l Bank v. Tenn-Fla Partners (In re Tenn-Fla Partners)*, 170 B.R. 946, 950 (Bankr. W.D. Tenn. 1994).

Before confirming the reorganization plan, the Bankruptcy Court held a hearing to determine the value of the Lakeside property.  After the contested hearing, the Bankruptcy Court valued the property at $9.1 million.  At the confirmation hearing held shortly thereafter in January 1994, Tenn-Fla, as the debtor in possession, agreed to pay $9,885,000 to purchase the bonds and effectively repurchase the property.  This was later characterized by the Bankruptcy Court as Tenn-Fla's agreement "to pay $9,885,000 (about $350,000 of which would go to First Union as part of an administrative claim) for the property and bonds.  This resulted in an approximate 75% recovery to the bondholders, with the shortfall being discharged."  *Tenn-Fla Partners v. First Union Nat'l Bank (In re Tenn-Fla Partners)*, 229 B.R. 720, 725 (W.D. Tenn. 1999).  As a result, the first mortgage bondholders, secured in the approximate amount of $12,685,000, accepted the plan and agreed to "write off" some $3.15 million of the first mortgage principal.  The Bankruptcy Court's confirmation order is dated January 21, 1994.

On February 2, 1994, less than two weeks after the entry of the confirmation order, Tenn-Fla entered into a sales contract with a real estate investment trust, United Dominion, in which United Dominion agreed to purchase the bonds and the Lakeside property from Tenn-Fla for $12,443,547.  As described by the Bankruptcy Court, the sale to United Dominion would have resulted in "an apparent net recovery to the debtor of approximately $2,500,000 over the amounts necessary to pay the bondholders and other creditors under the plan."  *In re Tenn-Fla Partners*, 170 B.R. at 951.

On March 3, 1994, First Union, as trustee for the bondholders, filed an adversary proceeding in Bankruptcy Court seeking revocation of the January 1994 confirmation order, damages for breach of fiduciary duty by Tenn-Fla and/or the general partners, and the imposition of a lien or constructive trust on the excess proceeds from Tenn-Fla's sale of the Lakeside property.  "At the heart of the complaint [was] the allegation that the debtor obtained the order of confirmation by fraud . . . ."  *Id.* at 949.  First Union argued that Tenn-Fla knew the property's true value and under-represented it at the bankruptcy confirmation proceeding so that the general partners could keep the proceeds in excess of $9,885,000 from the anticipated sale to United Dominion.

The Bankruptcy Court permitted Tenn-Fla to proceed with the sale of the bonds and the Lakeside property to United Dominion.  Tenn-Fla was also permitted to use the proceeds from the sale to make certain distributions required under the reorganization plan.  However, the Court required Tenn-Fla to put the remaining proceeds from the sale in escrow pending a determination of First Union's claim as trustee.  The Bankruptcy Court's order, dated April 1, 1994, stated:

---

[4]Tenn-Fla placed a "quick sale" liquidation value on the property of $6 million.  *In re Tenn-Fla Partners*, 170 B.R. at 952.

> The parties have agreed to proceed with the closing of the Contract between the Debtor and United Dominion and have agreed that all excess proceeds above normal closing expenses required by the Contract to be paid by Debtor as seller (which normal expenses include but are not limited to Debtor's attorney fees incurred with respect to the Contract) and funds necessary to pay or discharge the claims of Classes 4, 5, 6 and 7 as provided in the Debtor's plan. All such excess proceeds shall be placed in an interest bearing escrow account . . . pending further Order of this Court.

*See* Exhibit 6. The sale of the Lakeside property to United Dominion occurred on April 14, 1995. According to the Seller's Settlement Statement, a real estate commission of $134,500 was paid to the purchaser's real estate agent, Robert Smith ("Mr. Smith") at closing. However, the $142,000 commission from the sale to the seller's real estate agent, Mr. Coleman, was put in escrow.

In May 1994, the Bankruptcy Court had a trial on First Union's complaint against Tenn-Fla and its partners. After the trial, the Bankruptcy Court made extensive findings of fact and concluded that Tenn-Fla had committed fraud upon the court in misrepresenting the true value of the Lakeside property. *In re Tenn-Fla Partners*, 170 B.R. at 967-68. The Bankruptcy Court found that Tenn-Fla, through Mr. Coleman, had negotiated with United Dominion and other potential purchasers for a sales price far in excess of the $9.1 million value placed on the property by the Bankruptcy Court, and far in excess of the $9,885,000 Tenn-Fla was to pay to purchase the bonds and repurchase the property. At the same time, Tenn-Fla failed to disclose its negotiations with these potential purchasers to First Union, other creditors, or the Bankruptcy Court. Although Mr. Coleman's attorney had advised him to disclose any such offers to the Bankruptcy Court, he did not do so. In fact, he told potential buyers not to make offers while the property was in bankruptcy, "deliberately put[ting] off the receipt of actual offers until after the confirmation of [the] plan." *Id.* at 952-53. The Bankruptcy Court surmised:

> Tenn-Fla deliberately stalled purchasers, concealed that information, and repurchased the partners' equity interest at a sharp discount, knowing that it would be able immediately to resell the property with enough recovery to satisfy the partners' personal exposure to First Tennessee Bank. This was the debtor's acknowledged goal, and it would have accomplished it to the loss of the secured creditors but for this adversary proceeding.

*Id.* at 968. On the basis of Tenn-Fla's fraud, the Bankruptcy Court revoked the confirmation plan and converted the bankruptcy from a chapter 11 reorganization to a chapter 7 dissolution. *See id.* at 973. Tenn-Fla appealed, and the Bankruptcy Court's holding was affirmed by the United States District Court for the Western District of Tennessee, see 229 B.R. 720 (1999), and by the Sixth Circuit Court of Appeals, see 226 F.3d 746 (2000).[5]

---

[5]The Bankruptcy Court's decision to deny compensatory damages to First Union was reversed by the district court. *See In re Tenn-Fla Partners*, 229 B.R. at 737-38.

On June 25, 2001, after Tenn-Fla's appeals had been exhausted, the Bankruptcy Court issued an order releasing all of the funds held in escrow. Once released, the funds were paid to First Union as trustee for the bondholders. In December 2001, Mr. Coleman learned that the funds had been released from escrow. At that time, he made a demand to Tenn-Fla for payment of Coleman Management's real estate commission on the sale of the Lakeside property to United Dominion, but he did not receive it. He did not file a claim in the Bankruptcy Court requesting that Coleman Management be paid its commission on the sale.

## B. *Proceedings in the Lower Court*

On March 8, 2002, Coleman Management filed the instant lawsuit against Tenn-Fla and the general partners of Tenn-Fla, alleging claims based on breach of contract, breach of implied duty of good faith and fair dealing, *quantum meruit*, and unjust enrichment. On April 18, 2002, the defendants removed the case to federal court, claiming that federal jurisdiction was proper because Tenn-Fla was in bankruptcy. In response, Coleman Management voluntarily dismissed its claims against Tenn-Fla, leaving only the claims against Tenn-Fla's general partners. After that, the federal court concluded that it lacked subject matter jurisdiction and, in January 2003, the case was remanded back to the state trial court below.

On October 29, 2003, the remaining defendants, Tenn-Fla's general partners, ("Defendants"), filed a motion to dismiss arguing, among other things, that Coleman Management's claims were barred by the applicable statute of limitations, the doctrines of *res judicata* and collateral estoppel, and the equitable doctrine of unclean hands. On September 28, 2006, the trial court heard oral argument on the motion to dismiss. On October 10, 2006, it denied the Defendants' motion to dismiss and set the matter for trial.

The trial was set for February 19, 2007. That morning, before the trial began, the Defendants filed a motion for a directed verdict or, in the alternative, for entry of judgment in their favor, again raising the defenses of statute of limitations, *res judicata* and collateral estoppel, and unclean hands. The trial court took the motion under advisement and then proceeded with the testimony.

Mr. Coleman testified at the outset of the trial. The Settlement Statement for the closing on the Lakeside property was drafted by Mr. Coleman, Tenn-Fla's CFO, Steve Rudolph, and the attorneys for Tenn-Fla. They drafted the Settlement Statement to include a provision stating that Coleman Management's $142,000 real estate commission from the sale of the property would be placed into escrow along with the remaining funds from the sale. While drafting the settlement statement, Mr. Coleman said, the attorneys for Tenn-Fla specifically asked him whether he "had any problem" with putting Coleman Management's commission in escrow until a future date. He indicated to them that he did not, because he believed that Coleman Management's commission would be placed in safekeeping in escrow. Mr. Coleman said, "As long as I felt like my money was in escrow, I felt like it was safe."

Although the Bankruptcy Court released the escrow funds in June 2001, Mr. Coleman did not receive a copy of the Bankruptcy Court's order until December 2001, and said that he had no knowledge of the release of the escrow funds until he received the order. Mr. Coleman then asked

Tenn-Fla's attorneys for Coleman Managements' commission monies that had been released from escrow. They replied that "[t]hey didn't know where [the money] went." A few months later, Coleman Management filed this lawsuit.

Mr. Coleman admitted that, at the time the Bankruptcy Court valued the Lakeside property at $9.1 million, he knew that United Dominion and several others were interested in purchasing the property for a substantially higher price. He also acknowledged that he had told all prospective purchasers that Tenn-Fla could not sell the Lakeside property until the bankruptcy plan was confirmed. Just after the plan was confirmed, Mr. Coleman said, Tenn-Fla's attorneys and Dr. Meyer "wanted to sell it right quick and get rid of it." Soon thereafter, United Dominion and another prospective purchaser made official offers to purchase the property. Mr. Coleman asked the former CFO of Tenn-Fla, Steve Rudolph ("Mr. Rudolph"), whether selling the property so quickly would be legal, questioning whether such a quick sale on the heels of the Bankruptcy Court's confirmation would be as if Tenn-Fla had "slap[ed] the judge or the Court across the face with a wet fish." He said Mr. Rudolph assured him that it would be "fine and legal." Therefore, within two or three days, Tenn-Fla, through Mr. Coleman, accepted United Dominion's offer to purchase the property.

In Tenn-Fla's bankruptcy proceedings, Mr. Coleman said, he was never an actual party and he was never in an adversarial position. He asserted that the Defendants owed Coleman Management $142,000 in real estate commissions plus interest from the date of the sale, as well as attorney's fees under the management agreement. Coleman Management had admitted into evidence trial Exhibit 5, which included a calculation of the prejudgment interest it claimed was due under the contract. The Defendants expressed disagreement with Exhibit 5, but made no objection to the admission of Exhibit 5 into evidence.

The trial court also heard testimony from Mr. Rudolph. He acknowledged that he was involved in the negotiations surrounding the management agreement signed by the parties. When the document was signed, Mr. Rudolph said, he was aware of the commission provision and contemplated that Coleman Management would receive a commission from Tenn-Fla's sale of the Lakeside property to United Dominion. That concluded the evidence; the Defendants did not offer any rebuttal testimony or any evidence contrary to the commission calculations in Exhibit 5.

On October 30, 2007, the trial court entered an order denying the Defendant's motion for a judgment in their favor and granting a judgment in favor of Coleman Management. The trial court found that, under the management agreement, the Defendants, as the general partners of Tenn-Fla, owed Coleman Management its real estate commission for the sale of the Lakeside property. It further held that Coleman Management's claims were not barred by the applicable statute of limitations, because the commission was placed in escrow, and it was reasonable for Coleman Management to wait to request payment until the escrow funds were released. Consequently, the cause of action accrued at the earliest in June 2001, when the funds were released from escrow, and the March 8, 2002 lawsuit, therefore, was timely filed. The trial court rejected the Defendants' defense under the "unclean hands" doctrine, finding that it was irrelevant to the enforceability of the management agreement, because any acts of fraud or deceit were made in connection with the Bankruptcy Court's determination of the value of the property, not in the formation of the management agreement. Accordingly, the trial court awarded Coleman Management a commission

of $142,000, along with $405,030.28 in accrued prejudgment interest, for a total judgment of $547,030.28, plus post-judgment interest and costs.  The trial court denied Coleman Management's request for attorney's fees.  From this order, the Defendants now appeal.

ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the Defendants again argue that Coleman Management's claims are negated by their affirmative defenses of statute of limitations and the equitable doctrine of unclean hands.  The Defendants also assert that the trial court erred in its award of prejudgment interest.

Because this was a bench trial, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise.  ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001); Tenn. R. App. P. 13(d).  We afford great deference to the trial court's assessment of the credibility of the witnesses, and we will not reassess factual findings based on witness credibility unless clear and convincing evidence supports a different finding.  ***Humphrey v. David Witherspoon, Inc.***, 734 S.W.2d 315, 315-16 (Tenn. 1987).  The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness.  ***See State v. Levandowski***, 955 S.W.2d 603, 604 (Tenn. 1997).  Whether the doctrine of "unclean hands" should apply is an issue within the trial court's discretion and will not be reversed absent an abuse of that discretion.  ***See Mark Pirtle Chevrolet, Inc. v. Celebration Nissan, Inc.***, No. M2002-00554-COA-R3-CV, 2003 WL 21047139, at *4 (Tenn. Ct. App. May 9, 2003).  An award of prejudgment interest is also reviewed for an abuse of discretion.  ***Myint v Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998).

ANALYSIS

*A.  Statute of Limitations*

The Defendants first challenge the trial court's holding on the statute of limitations.  It is undisputed that the applicable statute of limitations for Coleman Management's breach of contract claim is six years.  ***See*** Tenn. Code Ann. § 28-3-109(a)(3).  In rejecting the Defendants' statute of limitations defense, the trial court found that Mr. Coleman acted reasonably in waiting until after the Bankruptcy Court released the escrowed funds in June 2001 to file the instant lawsuit for Coleman Management's commission, because Mr. Coleman had been advised by counsel for Tenn-Fla that his commission would be held for him in escrow:

> While Plaintiff may have earned his commission when the sale was consummated in April of 1994, the Court finds that it is reasonable that Plaintiff waited until the Bankruptcy Court released the escrowed funds, on June 25, 2001, to request payment and/or file suit for his commission.

Thus, the trial court concluded that the limitations period on Coleman Management's  cause of action began to run at the earliest in June 2001, when the escrow funds were released, or at the latest

-7-

in December 2001, when Mr. Coleman's demand for payment was refused. Therefore, the trial court reasoned, the lawsuit was timely filed on March 8, 2002.

A cause of action for breach of contract accrues on the date of the breach or when one party demonstrates a clear intention not to be bound by the contract.[6] ***Donovan v. Nat'l Commerce Bank Servs., Inc.***, No. W2000-03064-COA-R3-CV, 2002 WL 1751329, at *3 (Tenn. Ct. App. Mar. 15, 2002); ***Wilkins v. Third Nat'l Bank in Nashville***, 884 S.W.2d 758, 761-62 (Tenn. Ct. App. 1994). "Thus, the statute of limitations begins to run when a contracting party first knows or should know that the contract will not be performed." ***Wilkins***, 884 S.W.2d at 762.

In ***Donovan***, cited by the trial court, in August 1988, the plaintiff consultant and the defendant bank entered into a consulting contract that expired by its own terms in December 1988. The contract provided that the consultant would receive a salary plus $2,000 commission for each branch bank that was established in a supermarket due to the consultant's efforts. The contract expired, but the consultant continued to work for the bank for ten years with no written agreement. During that time, the bank never paid the consultant the $2,000-per-store commission. In 1990, the consultant demanded payment of the commission, but the bank ignored his demand. The bank terminated the consultant in October 1998. ***Donovan***, 2002 WL 1751329, at *1-2. In May 1999, the consultant filed suit against the bank claiming, among other things, that he was entitled to the $2,000-per-store bonus. The trial court granted summary judgment in favor of the defendant on the bonus claim, finding that it was barred by the six-year statute of limitations. The consultant appealed, and the appellate court affirmed. The appellate court found that the consultant's cause of action accrued no later than 1990, when his demand for payment of the bonus was ignored, demonstrating that the bank did not intend to honor this provision of the expired contract. ***Id.*** at *3.

In accordance with the analysis in ***Donovan***, the pivotal issue in this case is when Coleman Management knew, or when should it have known, that Tenn-Fla did not intend to honor its obligation under the management agreement to pay the commission for the sale of the Lakeside property. The Defendants argue that Coleman Management knew or should have known as early as April 14, 1994, the date of the sale, that Tenn-Fla would not fulfill its obligations under the contract. They point out that the Bankruptcy Court's April 1, 1994 order provided that "all normal closing expenses" must be paid immediately from the sale proceeds. Real estate commissions would be considered part of the "normal closing expenses," as evidenced by the fact that the buyer's real estate agent, Mr. Smith, was paid at the closing from the proceeds of the sale. Therefore, the Defendants contend, regardless of any understanding among the parties or any language in the Seller's Settlement Statement, Coleman Management became entitled to its commission on the date of the

---

[6]We note that this is a lawsuit to recover against the general partners for the liability of the partnership, Tenn-Fla. Pursuant to Tennessee Code Annotated § 61-1-306(a), "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." ***See also Miele v. Zurich U.S.***, 98 S.W.3d 670, 675 (Tenn. Ct. App. 2002); ***Unsecured Creditor's Comm. of Seasons Props. v. Miller & Martin (In re Seasons Props.)***, 141 B.R. 631, 634 (Bankr. E.D. Tenn. 1992). Thus, the breach of contract claims against the general partners could not arise until after the partnership had breached its obligation.

closing, April 14, 1994. When Coleman Management did not receive its commission on that date at the closing, its cause of action began to accrue. The Defendants further argue that Mr. Coleman's own testimony showed that he knew that Coleman Management had a claim for relief against Tenn-Fla as early as April 1994. Mr. Coleman testified that, when the sale took place, he "figured he would have to go to court for [the commission]." Thus, Mr. Coleman had actual knowledge that Coleman Management was entitled to its commission at the closing, and thus there was no basis for waiting eight years to file a lawsuit against Tenn-Fla's partners to collect it.

In response, Coleman Management asserts that, regardless of any language in the Bankruptcy Court's April 1994 order, the parties to the management contract – Tenn-Fla and Coleman Management – agreed that Coleman Management's real estate commission was owed at the closing in April 1994, but that the payment of it would be delayed until the escrow monies were released. This understanding, they claim, is evidenced in the Seller's Settlement Statement, which provides specifically that Coleman Management's $142,000 commission would be put in escrow along with the remaining funds from the sale. Therefore, regardless of whether this understanding was recognized by the Bankruptcy Court, Tenn-Fla did not express its intent to refuse to pay the commission until after the escrow funds were released and it denied Coleman Management's request to be paid out of the escrowed funds. In addition, Coleman Management argues that Mr. Coleman's testimony, when read in context, actually supports a finding that he reasonably believed that Coleman Management's real estate commission was in "safekeeping" in escrow, and that it was reasonable for him to wait until the escrowed funds were released before demanding payment of his commission.

The time at which Coleman Management knew or should have known that Tenn-Fla would not pay the commission under the contract is a question of fact, which we review under a "preponderance of the evidence" standard. *See* Tenn. R. App. P. 13(d). The trial court in this case made a factual finding that Coleman Management was reasonable in its belief that Tenn-Fla did not breach its agreement to pay the commission by not paying it on the date of the sale. Rather, it found that Mr. Coleman was advised by counsel for Tenn-Fla that Coleman Management's commission would be held in escrow, and that it was reasonable under the circumstances for him to wait to request payment of the commission until the Bankruptcy Court released the escrowed funds in June 2001.

The evidence submitted at trial clearly supported the trial court's findings. Undisputed evidence showed that the parties agreed that Coleman Management's commission would be paid from the escrowed funds as set forth in the Seller's Settlement Statement.[7] This arrangement was prompted by the changed circumstances. At the time that the parties executed the management agreement, the contemplated sale of the Lakeside property had not yet become controversial. Thereafter, of course, the trustee for the bondholders, First Union, sought to undo the Bankruptcy Court's confirmation order, asserting that Tenn-Fla obtained it by fraud. Mr. Coleman and Coleman Management bore some responsibility in this for failing to disclose to the Bankruptcy Court the

---

[7] The Defendants attempt to discount the significance of the Seller's Settlement Statement by asserting that it was prepared by Mr. Coleman. The proof at trial, however, shows that the document was prepared by the attorneys for Tenn-Fla, Hank Shelton and Brad Foster, and by the CFO of Tenn-Fla, Steve Rudolph, with Mr. Coleman's assistance.

negotiations for the sale of the Lakeside property. The Bankruptcy Court permitted the sale to United Dominion to go through only upon the proviso that the proceeds, less "normal closing expenses," would be put in escrow.

No objection was made in the Bankruptcy Court to the provision in the Settlement Statement indicating that Coleman Management's real estate commission would be paid at a later date from the escrowed funds. The Bankruptcy Court never addressed whether Coleman Management was entitled to a commission. Even though the Bankruptcy Court's order stated that "normal closing expenses" would be paid at the time of the closing, the evidence supports the trial court's finding that the parties understood that Coleman Management's commission would be placed in escrow, delaying payment of the commission until the escrow funds were released. Under these circumstances, Coleman Management's claim for the commission would not accrue at the time the sale of the property closed. Once the escrow funds were released, however, and Coleman Management's demand for payment of the commission was refused, it became clear that Tenn-Fla and its partners did not intend to fulfill the obligation to pay the commission as set forth in the management agreement and the Settlement Statement. At that point, Coleman Management's claim for breach of contract accrued. Under these circumstances, we cannot conclude that the evidence preponderates against the trial court's finding in this regard.

The Defendants argue that the statute of limitations was not tolled by putting Coleman Management's commission in escrow because, by agreeing to have the commission placed in escrow, Mr. Coleman was simply avoiding having the Bankruptcy Court adjudicate whether Coleman Management should be permitted to receive the commission. The Defendants assert, "In light of Mr. Coleman's actions during the bankruptcy, he knew that the Bankruptcy Court would never allow him a fee. He waited until the funds in escrow were disbursed to avoid entry of an order clearly declaring that he would not be allowed any fee in the matter." We must observe that no party – not First Union, not Tenn-Fla, not Tenn-Fla's partners, not Coleman Management – ever asked the Bankruptcy Court to adjudicate whether Coleman Management was entitled to its real estate commission under the management agreement. We decline to speculate on what the Bankruptcy Court's response to such a request would have been. We need only determine the issue presented to us on appeal, namely, whether Coleman Management's claim for breach of the agreement to pay its real estate commission accrued more than six years prior to the filing of its lawsuit. The evidence does not preponderate against the trial court's finding that Coleman Management's claim accrued when its demand for the commission was not satisfied after the escrow funds were released. Therefore, the lawsuit was timely filed in March 2002.

### B. Doctrine of Unclean Hands

The Defendants next argue that the trial court erred in failing to dismiss Coleman Management's claim based on the equitable doctrine of unclean hands. The doctrine is derived from the equitable maxim, "He who comes into equity must come with clean hands." *Segal v. United Am. Bank*, No. W2004-02347-COA-R3-CV, 2005 WL 3543332, at *4 (Tenn. Ct. App. Dec. 28, 2005) (citing Thomas v. Hedges, 183 S.W.2d 14, 16 (Tenn. Ct. App. 1944) (citing *Gibson's Suits in Chancery*, 42 and 51)). The doctrine of unclean hands has been described as follows:

The principle is general, and is one of the maxims of the Court, that he who comes into a Court of Equity asking its interposition in his behalf, must come with clean hands; and if it appear from the case made by him . . . that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

*Continental Bankers Life Ins. Co. of the South, Inc. v. Simmons*, 561 S.W.2d 460, 465 (Tenn. Ct. App. 1977) (citing *C.F. Simmons Medicine Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893)); *see also* HENRY R. GIBSON, GIBSON'S SUITS IN CHANCERY, § 2.09 (William H. Inman ed. 8th ed. Matthew Bender & Co. 2004)**.**

The trial court found that the unclean hands doctrine was irrelevant to the Defendants' liability under the management agreement:

This Court also finds any claim of "unclean hands" to be irrelevant in regard to the validity or enforceability of the Management Agreement. Any alleged acts of fraud or deceit were in connection to the Bankruptcy Court's determination of the value of the Property involved and not in the formation of the agreement.

Thus, the trial court denied the Defendants' motion to dismiss on this basis.

On appeal, the Defendants again contend that Mr. Coleman's fraudulent conduct, as detailed by the Bankruptcy Court, should prevent Coleman Management from recovering in this lawsuit. The Bankruptcy Court specifically found that Mr. Coleman made misrepresentations to the Bankruptcy Court regarding the value of the Lakeside property "for his own benefit," and that Mr. Coleman was motivated by the misconception that Coleman Management would not be paid a real estate commission if the property were sold while Tenn-Fla was in bankruptcy:

Mr. Coleman's agreement with the debtor provided for a real estate commission to Mr. Coleman in the event of a sale of the property. Trial exhibit 29. In the September 14, 1992 conversation with Mr. Smith, Mr. Coleman also told Mr. Smith that neither of them could realize a real estate commission out of a sale during bankruptcy, as the bankruptcy court would not "pay" a commission. Smith deposition, p. 46. This was obviously an incorrect conclusion of statement, as bankruptcy courts frequently approve commissions for professionals who have been employed properly and who benefit the bankruptcy estate by production of sales. *See* 11 U.S.C. § 330. *Nevertheless, Mr. Coleman's statement indicates a higher concern for his own benefit than for the benefit of creditors or of the bankruptcy estate.*

*In re Tenn-Fla Partners*, 170 B.R. at 952 (emphasis added). The Bankruptcy Court found that Mr. Coleman discouraged prospective buyers from making formal offers on the Lakeside property during the bankruptcy proceedings, asking them to defer any offers until after the reorganization plan was confirmed. The Defendants argue that Mr. Coleman's fraudulent, self-serving conduct related to the

sale of the Lakeside property, and therefore that Coleman Management should be "repelled from the threshold of the court." GIBSON, *supra*, at § 2.09.

In response, Coleman Management argues that the trial court soundly exercised its discretion in rejecting the Defendants' "unclean hands" defense, because any alleged fraud by Mr. Coleman did not involve the formation of the management agreement, which is the subject of this lawsuit. This is a legal and not an equitable claim, Coleman Management argues, and so the doctrine of "unclean hands" applies only if the unconscionable conduct arises out of the "particular transaction which is the subject of the litigation." *Metric Partners Growth Suite Investors, L.P. v. Nashville Lodging Co.*, 989 S.W.2d 700, 703 (Tenn. Ct. App. 1998). Here, in the absence of any proof of fraud with respect to the management agreement, the doctrine of "unclean hands" is not a valid defense. Furthermore, Coleman Management claims that the Defendants misconstrue the effect of the Bankruptcy Court's orders, asserting that the Bankruptcy Court did not and could not have found Mr. Coleman guilty of fraud because, if nothing else, Mr. Coleman was not a party to the bankruptcy and was not within the jurisdiction of the Bankruptcy Court. In fact, Mr. Coleman was acting as a representative of Tenn-Fla and was working to maximize the interest of the Defendants. Any misconduct on the part of Mr. Coleman was committed against third parties, such as First Union, the bondholders, and other creditors, not against Tenn-Fla or the Defendants, and thus would not negate the Defendants' obligations to Coleman Management under the management agreement.

Coleman Management rightly notes that, for the unclean hands doctrine to apply, the inequitable or immoral conduct "must relate to the particular transaction which is the subject of the litigation." *Chappell v. Dawson*, 308 S.W.2d 420, 421 (Tenn. 1957). The Supreme Court has stated:

> The controlling principle is thus stated in Gibson's Suits in Chancery [citation omitted]: "But the operation of the maxim is confined to misconduct connected with the particular matter in litigation; and does not extend to any misconduct, however gross, which is unconnected therewith, and with which the defendant is not concerned."

*Id.* Furthermore, the application of the doctrine is clearly within the discretion of the trial court:

> Decisions regarding the proper application of the doctrine of unclean hands are heavily fact-dependent and are addressed to the considerable discretion of the trial court. Accordingly, credibility determinations can be pivotal, and the trial court is in the best position to make these determinations because it has the opportunity to view the witnesses as they are testifying.

*In re Estate of Boote*, 265 S.W.3d 402, 418 (Tenn. Ct. App. 2007).

From a careful review of the record, we conclude that the trial court did not abuse its discretion in declining to apply the unclean hands doctrine to "repel[] [Coleman Management] at the threshold of the court." Gibson's at 42, 51. The Bankruptcy Court indeed found that Mr. Coleman misrepresented the value of the Lakeside property to the Bankruptcy Court, in part to further his own

interests. However, the trial court correctly found that Mr. Coleman's actions did not relate to the formation of the management agreement between Coleman Management and Tenn-Fla, and that the management agreement is the source of the Defendants' obligation to pay the real estate commission. Furthermore, it is not inappropriate to consider the fact that the victims of any misconduct by Mr. Coleman were Tenn-Fla's creditors, not the Defendants. As the Bankruptcy Court found, the Defendants' interests were aligned with Mr. Coleman's. The Defendants, even more than Mr. Coleman, stood to benefit from the sale outside of bankruptcy: "Tenn-Fla deliberately stalled purchasers, concealed that information, and repurchased the partners' equity at a sharp discount, knowing that it would be able to immediately resell the property with *enough recovery to satisfy the partners' personal exposure* to First Tennessee Bank." *In re Tenn-Fla Partners*, 170 B.R. at 968 (emphasis added). Under all of these circumstances, we find no abuse of the trial court's discretion in declining to apply the unclean hands doctrine to reject Coleman Management's claim for the real estate commission.[8]

## C. Prejudgment Interest

The Defendants argue that the trial court erred in awarding Coleman Management prejudgment interest of "$405,030.28, as proven at trial . . . ." They claim that Coleman Management was not entitled to any prejudgment interest based on the equities of the case, noting that Mr. Coleman committed fraud before the Bankruptcy Court, did not request his commission from the Bankruptcy Court at the closing on the sale of the property, and voluntarily agreed to delay payment of the commission. The Defendants also point out that they did not have use of the monies while they were in escrow. Moreover, arguing that Coleman Management "cannot have it both ways," the Defendants assert that either Coleman Management became entitled to its commission in April 1994, in which case the claim is untimely, or it became entitled to the commission when the escrowed funds were released in June 2001, and prejudgment interest should run from that date. The Defendants also contend that, even if prejudgment interest were warranted, the amount should have been calculated according to the 10% per year simple interest authorized by Tennessee Code Annotated § 47-14-123. Under this calculation, the Defendants argue, the amount of the prejudgment interest would be $192,339, rather than the $405,030 awarded by the trial court.

The Tennessee Supreme Court has outlined the standard for determining whether an award of prejudgment interest is appropriate in a given case:

> Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Simply stated, the court must decide whether the award of pre-judgment interest is fair, given the particular

---

[8]The Bankruptcy Court's findings are unclear on the extent to which representatives of Tenn-Fla and the individual partners were involved in the fraud committed on the Bankruptcy Court. The Bankruptcy Court opined that it was "persuaded that Dr. Meyer was kept somewhat in the dark of all of the actions and the implications thereof taken by Mr. Coleman in regard to interested purchasers." *In re Tenn-Fla Partners*, 170 B.R. at 952. It further noted, however, that it was "not necessary that Dr. Meyer or the partners expressed a specific intent to defraud. . . . [T]he actions of the partnership may provide a basis upon which fraudulent intent may be inferred. And, Dr. Meyer and the other partners had authorized Mr. Coleman to act on behalf of the partnership." *Id.*

-13-

circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize the defendant for wrongdoing.

*Myint*, 970 S.W.2d at 927 (citation omitted); *see also Scholz v. S. B. Int'l, Inc.*, 40 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000) (discussing the impact of *Myint*). Generally, an award of prejudgment interest is permitted if two criteria are met: (1) the amount is certain or easily ascertainable and (2) the obligation is not disputed on reasonable grounds. *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405-06 (Tenn . Ct. App. 2005). "An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint*, 970 S.W.2d at 927; *see also Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992).

Coleman Management's calculation of prejudgment interest, contained in Exhibit 5, was admitted into evidence during Mr. Coleman's testimony. The Defendants did not submit any countervailing evidence regarding prejudgment interest, did not challenge the calculations in Exhibit 5, and did not object to the admission of Exhibit 5 into evidence. The following colloquy took place:

> [Counsel for Plaintiff]: I move that these calculations to Mr. Coleman on interest be admitted as the next document.
>
> THE COURT: Any objection?
>
> [Counsel for Defendants]: We have no objection as to what they state.
>
> THE COURT: I admit – I acknowledge you're not agreeing to them.
>
> [Counsel for Plaintiff]: Your Honor, if we could have Exhibit handed back to the witness.

Thus, the most that can be said is that the Defendants did not agree to Exhibit 5. No other objection was made to the prejudgment interest requested by Coleman Management.

The Defendants raised interesting arguments on appeal regarding the award of prejudgment interest, particularly the argument that prejudgment interest must be calculated according to T.C.A. § 47-14-123 rather than by some other methodology. Unfortunately, none of these arguments were raised to the trial court. In general, issues not raised to the trial court cannot be raised for the first time on appeal. *In re Sentinel Trust Co.*, 206 S.W.3d 501, 528 (Tenn. Ct. App. 2005). Apparently recognizing this problem, the Defendants assert that the issues of prejudgment interest are properly before this Court because its argument "is based upon errors of law by the Trial Court," which are

reviewed *de novo* on the record.[9]  (Emphasis in original).  However, the principle that issues not raised to the trial court cannot be raised for the first time on appeal is not limited to questions of fact.  *See, e.g., id.* (involving interpretation of a statute); *see also Carr v. McMillan*, No. M2007-0085-COA-R3-CV, 2008 WL 2078058, at *4 (Tenn. Ct. App. May 14, 2008) (involving the constitutionality of a statute).  Moreover, the award of prejudgment interest is a discretionary matter based on the equities of the particular case.  Where the trial court's decision is a discretionary one, "[i]t is impossible to determine that the Trial Court abused its discretion when it never had the opportunity to exercise that discretion in the first place."  *Long v. Pannell*, No. E2002-01792-COA-R3-CV, 2003 WL 21276540, at *9 (Tenn. Ct. App. May 30, 2003).  In *Long*, we explained that, if a matter never becomes an issue in the trial court, opposing counsel does not have an opportunity to make a countervailing argument, and the trial court is denied the opportunity to exercise its discretion based on full consideration of the competing arguments.  Therefore, when the trial court is not asked to decide an issue at trial, "there could be no abuse of discretion by the Trial Court as to this issue."  *Id.* (citing *Hobbs v. Hobbs*, 987 S.W.2d 844, 847 (Tenn. Ct. App. 1998)).  Here, the Defendants presented to the trial court neither arguments nor evidence regarding prejudgment interest.  Under these circumstances, we cannot find that the trial court abused its discretion in awarding prejudgment interest in a manner consistent with the proof presented at trial.

### D.  Bankruptcy Court's Confirmation Order

As a final matter, the Defendants argue that Coleman Management is not entitled to a commission for the sale of the Lakeside property because the management agreement providing for the commission was voided by the order of the Bankruptcy Court entered on January 21, 1994, confirming Tenn-Fla's reorganization plan.  That order provided that "all executory contracts and unexpired leases of the Debtor shall be rejected as of the Effective Date . . . ."  This argument is without merit for several reasons.  First, the Bankruptcy Court order on which the Defendants rely provided specifically that Coleman Management was to "receive the same compensation that it currently receives under its management agreement with Debtor."  Thus, the order preserves Tenn-Fla's obligation to pay a real estate commission under the management agreement with Coleman Management.  In addition, the confirmation plan approved in the January 1994 order was later revoked when the Bankruptcy Court permitted the sale of the Lakeside property to United Dominion to go forward.  Moreover, none of the Bankruptcy Court's orders specifically address whether Coleman Management was entitled to a commission under the management agreement.  The Defendants cite no law to support their assertion that Coleman Management's sole remedy was to seek recourse from the Bankruptcy Court.  Therefore, we reject the Defendants' argument that the Bankruptcy Court's January 21, 1994 order strips Coleman Management of its right to receive the real estate commission on the sale of the Lakeside property.

### CONCLUSION

---

[9] The Defendants also argue that Coleman Management is not entitled to an award of prejudgment interest because it is entitled to no commission at all based on the statute of limitations.  In light of our resolution of the other issues in this appeal, this argument is rejected.

-15-

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants David Meyer, James W. Rayner, Richard D. Baker, Rose McKee, NCF Associates, and their surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE