**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0424n.06

Case No. 19-6258

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jul 22, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
|     Plaintiff, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| HERITAGE GLASS, LLC; DANIEL VICTOR DAVIS, individually; THOMAS ERIC KERNEY, individually, | ) ) ) ) | |
|     Defendants, | ) ) | |
| DANIEL VICTOR DAVIS, | ) ) | |
|     Third-Party Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) ) | |
| CHRISTOPHER R. CORDING, | ) ) | |
|     Third-Party Defendant-Appellant. | ) ) ) | |

BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge. Daniel Davis sued Chris Cording for his share of a power bill after their glass-manufacturing company went bankrupt. Cording did not dispute that he owed Davis money. He instead claimed that Davis's behavior during their business relationship—his

"unclean hands"—should preclude any recovery. After a bench trial, the district court granted relief to Davis. We affirm.

I.

Daniel Davis met Chris Cording in 2013, and the two saw an opportunity to work together. Cording wanted to reopen a glass-manufacturing plant and needed trucks to haul raw materials. Davis ran a construction company and "had trucks available." R.168 at 10.

Davis didn't intend to become more involved in the business. But in early 2014, as plans to reopen the plant finalized, Cording approached Davis with another proposition. The company, Heritage Glass, LLC, needed to raise capital. A "major investor" had dropped out and Cording asked Davis to invest $500,000. *Id.* at 12. Cording projected sales for the year at $21 million. Davis "felt like it was a good investment" with "a lot of potential," and he made the investment. *Id.*

Cording, Davis, and Thomas Kerney (the pair's mutual friend and another investor) served on Heritage Glass's board of directors. Davis agreed to be on the board, with the understanding that "management of the company" would handle "any financial decisions . . . on a day-to-day basis." *Id.* at 19. His goal for the rest of 2014 "was to raise additional capital for the company." *Id.*

Besides his time, Davis also invested more money. Running a glass-manufacturing plant requires a lot of energy. Cording approached American Electric Power to supply the company's energy needs. American Electric agreed, but "they wanted a deposit . . . equal to two months[']usage at the time." *Id.* at 20. Heritage Glass didn't have that much cash on hand, and it approached the North American Specialty Insurance Company for help. North American Specialty agreed to

provide American Electric a security bond for $525,000, but in exchange Davis, Cording, and Kerney had to sign guarantees for the amount.

Once Heritage Glass started the plant, it began incurring enormous power costs—hundreds of thousands of dollars per month. That became a problem when it failed to meet its sales targets. In 2014, the company lost $2.3 million.

Leadership problems and internal friction emerged. The company had trouble making decisions, and some saw Cording as the problem because "everything went through him." *Id.* at 69. Cording clashed with Kerney who served as the company's president in addition to his role as director. Eventually the pair asked Davis to choose between them who should leave the company. Davis said that Cording should leave.

From that point on, Cording had no active involvement in the company though he remained a member of the LLC. Davis contacted "anybody and everybody that [he] could talk to" about investing. *Id.* at 31. To bridge the gap, Davis loaned the company revenues from his construction business. Unable to secure funding from others, Davis reached out to an existing investor, Bill Thomas, and convinced him to loan the company $2 million. In exchange, Davis provided Thomas personal collateral: "a 75 acre farm, another 20 acre commercial site and then a 35 lot subdivision I had developed." *Id.* at 73. The company's management used the money to pay a variety of bills. A portion went to the power company to prevent a disconnect. Another portion went to repay loans from Davis's and Kerney's companies.

Despite Davis's efforts and Thomas's money, the company did not regain its footing. In May 2015, American Electric shut off the power. Davis scrambled to get the power back on while a system of backup generators kept the furnace running. Failure to do so would "destroy and freeze the furnace." *Id.* at 22. American Electric and Heritage Glass worked out an agreement.

The directors would raise the amount of the security bond with North American Specialty to $750,000 and American Electric would restore power. Cording had no role in these discussions.

A few weeks later, the company ceased operations and ceased making payments. After Heritage Glass defaulted on its power bill in June, North American Specialty paid American Electric the full amount of the bond. Heritage Glass, insolvent at the time, does not appear to have paid anything on the debt. North American Specialty then went after the guarantors. Kerney discharged his liability in a personal bankruptcy case. Cording did not pay anything toward the debt. Davis paid $600,000 (more than double his share of the debt) to North American Specialty in exchange for a release and an assignment of North American Specialty's claim against Cording.

Davis sued Cording to collect on the assignment. The district court held a bench trial and ruled that Cording could not raise an unclean-hands defense against the contract claim for two reasons: (1) Davis brought the insurance company's contract claim, not his own, and the insurance company did nothing wrong; and (2) Davis did not act inappropriately anyway—or at least not in a way that deprived him of a right to recovery. The court awarded Davis $300,000 in damages and $73,783.65 in attorney's fees.

## II.

On appeal, the parties share common ground about several aspects of this contract case. They agree that Tennessee law applies. They agree that Cording is liable under the terms of the assignment contract. And they agree about our standard of review—that we review the district court's legal conclusions with fresh eyes and its fact findings for clear error. What separates the parties is whether Davis's "unclean hands" preclude him from recovering. We think not.

Start with the reality that nothing in Tennessee law prohibited this contract assignment. Davis sued Cording on North American Specialty's claim. Contract claims are assignable in

Tennessee. *Can Do, Inc. Pension & Profit Sharing Plan & Successor Plans v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 866–67 (Tenn. 1996). Cording does not claim that any misconduct occurred in making the assignment. He admits that he owes North American Specialty under the guarantee agreement. And he acknowledges that North American Specialty has not done anything that would bar recovery if the company had filed this claim. All we have, then, is a fair exchange: Davis bought the right to recover money Cording admits he owes.

Nor does Tennessee law bar the claim based on Davis's allegedly "unclean hands." It is by no means clear that the Tennessee courts would recognize this equitable defense in the context of a contract action. *See Baugh v. Novak*, 340 S.W.3d 372, 382 (Tenn. 2011). But even if they did, there are two problems with applying the defense here.

One, the argument overlooks a central principle of assignment law. In Tennessee as elsewhere, an assignee "steps into the shoes of his assignor and takes his assignor's rights subject to all defenses which may be asserted against *the assignor* in an action to enforce the right." *Binswanger S. (N.C.), Inc. v. Textron, Inc.*, 860 S.W.2d 862, 865 (Tenn. Ct. App. 1993) (emphasis added); *see Can Do, Inc.*, 922 S.W.2d at 866–67. In this instance, no one alleges that North American Specialty did anything wrong in general or in agreeing to this assignment in particular. Nor, it bears adding, do any of Cording's allegations about Davis's conduct have anything to do with the assignment itself. He paid a fair amount for it, and now wishes to enforce his rights under it. Even when Tennessee courts have applied the unclean hands defense, they have insisted that "the inequitable or immoral conduct must relate to the particular transaction which is the subject of the litigation." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 353 (Tenn. Ct. App. 2009) (quotation omitted). That's difficult to maintain with respect to this bargained-for exchange and with respect to this assignment. All that the assignment allowed was for North American Specialty

to be paid promptly, as it was entitled to be, and for Davis to take on the thankless job of collecting from Cording.

Put another way, how would it improve matters to force North American Specialty to recover the money directly from Cording and to let Davis off the hook by having to pay only $300,000 at the outset? That ends up defeating two agreements, not one. It would prohibit Davis from collecting the Cording part of the settlement—the $300,000—through a legitimate assignment. And it would prohibit North American Specialty from collecting on the guarantee by its terms at the outset—from any or all guarantors. Joint and several guarantees would not work well, or would not work fairly, without the possibility of assignments.

Two, Cording did not show that Davis had "unclean hands." The defense required Cording to prove Davis did something "unconscionable, inequitable, immoral, or illegal." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007). The court found that Cording failed to show unclean hands. Its decision did not sink to the level of an abuse of discretion. *Meyer*, 304 S.W.3d at 353.

Consider the evidence presented at the bench trial. Cording approached Davis to provide a service for his startup. He then promised Davis an equity stake in what he described as a promising company if Davis provided $500,000 to fill the gap left by another investor. Davis agreed. He then agreed to take on a personal indemnity to ensure the company could have power. When the business ran into problems, Cording asked Davis to decide who should lead it. As Heritage Glass's fortunes spiraled downwards, Davis provided more of his own funds to keep it afloat. When that did not suffice, he pledged over a hundred acres of personal property to secure another investment. The company used some of those funds to pay back a portion of what he was owed to keep his other business running. When the power company shut off the plant's electricity,

Davis scrambled to find a way to keep the business going, and the company made an eleventh-hour call to increase the directors' liability. When things unraveled in full, Davis attempted to mediate a resolution. Cording chose not to pay as part of that process. Davis then filed a claim against Cording to force him to pay his share, *id.* at 36, a share that does not cover all of the money Davis committed to Heritage Glass.

That does not seem unconscionable, immoral, or illegal. As a director, Cording could have questioned the company's decision-making at the time, and he opted not to do so.

It's not that easy, Cording says. Remember that Davis paid his company back over $300,000 instead of paying down the power bill or paying Cording back his $88,000 loan—a transaction that, in Cording's eyes, amounted to a fraudulent conveyance. Davis knew this kind of "self dealing" was wrong, Cording adds, because Davis fired Kerney in 2016 when he learned that Kerney directed a $2,500 payment to himself instead of other creditors.

But Tennessee fraudulent conveyance law gives creditors a cause of action if a debtor pays an insider, like Davis, before paying other debts. Tenn. Code Ann. § 66-3-309(b). Cording was an LLC member, not a creditor, of Heritage Glass. Tennessee law also recognizes that payments to insiders are valid if made in the ordinary course of business. *Id.* § 66-3-309(f)(2). Cording hasn't shown that Davis took steps outside of the ordinary course of Heritage Glass's business.

Tennessee requires a director to discharge his duties in good faith, with ordinary care, and in a manner the director reasonably believes to be in the best interest of the LLC. *Id.* § 48-249-403(i)(4). After securing funding that would keep the company afloat (with a large amount of personal collateral), Davis directed the company to pay him back a portion of what his company was owed. Keep in mind that the company's operating agreement permitted members, like Davis,

to loan the company money. And it prioritized repaying those loans over making distributions. Cording has not shown that Davis failed to act in the best interests of the LLC.

As for firing Kerney, Davis testified that he made the decision on "advice from counsel" after the company decided it would not make personal distributions and Kerney violated the agreement. R. 168 at 66. That's a distant cry from the company's decision to pay a variety of *debts*, including one owed to Davis's company.

Even if all that's true, Cording objects, Davis increased the directors' liability by $250,000 when he secured a new bond from North American Specialty for the power company. That's true, but this action didn't sully Davis's hands. Cording offers no case law to suggest Davis violated any laws when he took this step. Management acted to keep the ship afloat. Had Heritage Glass not taken this step, it would have ensured an immediate default on the power bill and liability for Cording. By seeking the increase, it created the possibility that the company could continue operating and start making money. Cording had the means to avoid the problem anyway. The contract allows a single director to "terminate [his] obligations under the Agreement by giving the Surety written notice." R. 190-5 at 2. Cording never invoked this option, not even after the company fired him.

Two loose ends remain. One is attorney's fees. The parties do not dispute the amount the district court awarded. And they agree that, if North American Specialty had brought this claim, it would have a right to fees under the contract. The only question is whether Davis can recover fees while he stands in North American Specialty's shoes. We see no reason why not given all we have just said. After the unchallenged assignment, Davis had a contractual right to demand

indemnification from Cording as well as attorney's fees incurred while "seeking recovery under the terms of [the] agreement." *Id.* at 1. That's all he did.

The other loose end concerns parallel proceedings in state court. Cording is concerned about the preclusive effect of any federal court decision about whether Davis breached his fiduciary duties when he fired Cording, among other acts. In one sense, this potential problem is one of Cording's own making. He can't raise an unclean hands defense in federal court, point to alleged fiduciary breaches as evidence of misconduct, and expect us to ignore the argument. But in another sense, the concern is overstated. While there may be some overlap between an unclean hands defense and a fiduciary breach claim, they have plenty of differences. All we have in front of us is the question whether the district court abused its discretion in deciding that this equitable defense did not preclude recovery on the assignment. That leaves plenty of room for following Tennessee fiduciary-breach law wherever it leads in terms of the actions of Davis, Cording, and Kerney in trying to right this ship.

We affirm.